## KANSAS CITY SOUTHERN RY. CO. et al. v. COMMISSIONER OF INTERNAL REVENUE. *

### No. 9071.

Circuit Court of Appeals, Eighth Circuit.

Aug. 31, 1931.

Rehearing Denied Oct. 5, 1931.

*Certiorari granted 52 S. Ct. 131.

Samuel W. Moore, of New York City (Frank H. Moore, of Kansas City, Mo., and Fred R. Angevine, of New York City, on the brief), for petitioners.

L. A. Norman, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C. (G. A. Youngquist, Asst. Atty. Gen., J. Louis Monarch, Sp. Asst. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, of Washington, D. C., on the brief), for respondent.

Before KENYON and BOOTH, Circuit Judges, and OTIS, District Judge.

KENYON, Circuit Judge.

This appeal is to review a decision of the United States Board of Tax Appeals determining deficiencies in income taxes against petitioners (hereinafter referred to as petitioner) for the calendar years 1918 and 1919 in the amount of $63,844.77 for the year 1918, and $127,722.28 for the year 1919. Petitioner consists of the Kansas City Southern Railway Company, with a number of affiliated and subsidiary companies, and is a common carrier operating a line of railroad from Kansas City south. There was an agreed stipulation of certain facts. Others were pleaded in the petition and the amended petition, and admitted by respondent in its answer and amended answer. The Board of Tax Appeals (hereinafter called the Board) made certain findings of fact.

Petitioner's railway system, the main line extending from Kansas City to Port Arthur, was built through a country somewhat sparsely settled. It had heavy grades, and later desired to reduce these to place the property in condition to meet active competition of other lines. The problem was met by the construction of short sections of new road in substitution for portions of the old. The tracks were removed to adjacent parcels of ground which were procured and substituted for the original parcels and the use of the latter was discontinued. These changes were very extensive and involved heavy expenditures. The work was completed in 1912 at an expense of several million dollars. In addition to the revision of the grades, petitioner abandoned its shop and terminal plant at Shreveport, La., and constructed at that place a new and enlarged plant at a different location. This was completed in 1912. One of the division points of petitioner prior to 1910 was at Mena, Ark. In that year petitioner organized the Mena Land & Improvement Company (hereinafter designated Mena Company) under the laws of the state of Arkansas with an authorized capital of $25,000. All of the stock was owned by petitioner. In the interest of economy the Mena division was changed to other places on September 15, 1910, which required employees who had homes in Mena to move to such other division points. The purpose of organizing the Mena Company was to take over these homes and save the employees from loss. This company acquired the property of the employees situated at Mena at cost price to such employees, and petitioner advanced to this company, which was merely an instrumentality to handle the matter, necessary sums of money to accomplish the purpose of its organization aggregating between September, 1910, and April, 1918, $136,200 over and above the $25,000 par value of the stock of the Mena Company. This $136,200 was carried on the books of petitioner in open account as advances to the Mena Company. In 1919 petitioner sold to outside interests the entire capital stock of the Mena Land & Improvement Company for the sum of $40,000.

The orders, regulations, and classifications of the Interstate Commerce Commission applicable to keeping accounts of steam rail-

roads made it necessary that petitioner should charge to operating expenses the estimated cost, less salvage, of replacing the discontinued portions of the road as well as the estimated replacement value less salvage of the old shop and terminal plant at Shreveport. Suit was brought by petitioner to restrain the enforcement of these regulations so far as they required petitioner to charge against its earnings the estimated replacement value, which resulted in sustaining the Commission's regulations (Kansas City Southern R. Co. v. United States [Com. Ct.] 204 F. 641; Id., 231 U. S. 423, 34 S. Ct. 125, 58 L. Ed. 296, 52 L. R. A. [N. S.] 1), and after prolonged litigation application was made to the Commission for permission, which was granted, to spread the estimated cost, less salvage, of replacing the discontinued portion of the road and the estimated replacement value of the abandoned terminal in annual installments over a period of fifteen years ending December 31, 1925. Petitioner charged to operating expenses during the years 1918 and 1919 one-fifteenth of the aggregate cost of the program of changing the grades and terminal completed in 1912. This was $89,181.72 for the year 1918, and $89,993.40 for the year 1919. These amounts were claimed as deductions from taxable income in petitioner's consolidated corporation income and profits tax returns for those years.

On January 1, 1918, under the provisions of the Army Appropriation Act of August 29, 1916, the President took possession and assumed control of the properties of petitioner and certain of its affiliated companies, and through the Director General of Railroads used and operated the properties during the twenty-six months' period from January 1, 1918, to February 29, 1920, for which compensation was agreed upon in the amount of $8,222,950.82, or $3,800,000 annually.

The Board held that the deductions claimed for the years 1918 and 1919 were not allowable, that the loss sustained by petitioner in the transactions of taking over the homes of its employees at Mena, Ark., was not a deductible one, and that the amount paid petitioner as compensation for the use of its properties during the period of federal control constituted taxable income.

Three questions are raised here for our determination: (1) Did the Board err in holding that the amounts charged by the petitioner to operating expenses for the years 1918 and 1919, respectively, on account of obsolescence or abandonment of property, were not proper deductions from gross income? (2) Did it err in holding that the loss sustained by petitioner in taking over the homes of its employees at Mena, Ark., did not constitute a deductible loss? (3) Did it err in holding that the amount paid the petitioner as just compensation for the taking and use of its properties during the period of federal control constituted taxable income?

These in their order.

■ The first question involves the application of subdivision (7) of the Revenue Act of 1918 (40 Stat. 1057, 1077, c. 18) to the facts. It provides:

"Sec. 234. (a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions: * * *

"(7) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence."

Allowances for depreciation, exhaustion, wear and tear of property, obsolescence, are matters of favor and not of constitutional right. · They exist by virtue of statute alone, and hence are only such as the statute expressly gives. Petitioner's theory is that obsolescence or abandonment of property represent a capital loss and that in charging the same to operating expenses the amount is paid back by the public, and constitutes return of capital. That this restoration of capital is not taxable income. The position of respondent is that there is no authority under section 234 (a) (7) of the Revenue Act of 1918 or any other section of that act permitting a deduction for obsolescence of property which was not used in the business during the taxable years and which in fact went out of existence prior to March 1, 1913. The Board took this view of the matter.

■■ The Income Tax Law is based on a theory of annual accounting periods—yearly gains and losses. It provides for a tax on yearly income. "Taxable year," "tax year," and similar terms are used throughout the Income Tax Act. The yearly period is the unit. Section 234 (a) subdivision (7) does not specify exhaustion, wear and tear, or obsolescence for the *taxable year*, but it is part of a general series of provisions, to-wit, subdivisions 1, 2, 3, 4, and 5 of section 234 (a), which relate in express terms to taxable year. It would not be reasonable to suppose that the provision of said subdivision (7) providing an allowance for exhaustion,

wear and tear, and for obsolescence covers any tax year with respect to property used in the trade or business no matter when that year might be, when losses sustained, debts ascertained to be worthless, expenses incurred, interest or taxes paid, were under the same section limited as credits for deductions to the taxable year. Considering the context of the various subdivisions of section 234 (a), it is reasonably clear that division (7), 234 (a), relates to a taxable year even though that term is not specifically employed.

■ Petitioner seeks here a deduction as to taxes for the years 1918 and 1919 for obsolescence which occurred prior to 1913. Absent any action of the Interstate Commerce Commission (hereinafter discussed), it seems clear that no such deduction could be made.

The rule as to allowance for exhaustion, wear, and tear of property used in the trade or business is the same as the rule concerning obsolescence. We think no case can be found holding that exhaustion, wear, and tear of former years may be carried over and deducted in arriving at the income in some subsequent year. A loss attributable to a particular year is a loss occurring by reason of something happening in that year. It is not given to parties to make choice as to the years in which they will take reductions. We know of no authority in any statute permitting deductions for obsolescence of property which was not used in the trade or business during the taxable year. There have been provisions in the statutes permitting the carrying of a net loss over to the next year where it has resulted from the operation of a trade or business. Section 204 of the Revenue Act of 1921 (42 Stat. 231). In section 204 (b) of the Revenue Act of 1918 (40 Stat. 1060), some leeway is given to the Commissioner in certain cases to credit or refund to the taxpayer amounts for other years, but this is not general. Such exceptions in the statutes show the clear intention of the Congress that the yearly period is the unit for determining tax liability. We refer to some of the decisions. In United States v. Ludey, 274 U. S. 295, 304, 47 S. Ct. 608, 611, 71 L. Ed. 1054, Justice Brandeis said: "The amount of the gain on the sale is not dependent on the amount claimed in earlier years. If in any year he has failed to claim, or has been denied, the amount to which he was entitled, rectification of the error must be sought through a review of the action of the bureau for that year. He cannot choose the year in which he will take a reduction." In Hardwick Realty Co. v. Com-

missioner of Internal Revenue (C. C. A.) 29 F.(2d) 498, 500, it is said: "If the loss by depreciation—that is, the wear and tear—cannot be recouped for tax purposes, by using it to reduce gross income because the income is not enough, that loss cannot be reserved for use in a future year, except to the limited extent permitted by section 204 (b) of the act." In Gambrinus Brewery Co. v. Anderson, 282 U. S. 638, 643, 644, 645, 51 S. Ct. 260, 261, 75 L. Ed. 588, the brewery company attempted under section 234 (a), subdivision (7), of the Revenue Act of 1918 to secure an allowance for obsolescence of its buildings resulting from the imminent taking effect of prohibition. The court recognizes there the yearly period, and in pointing out that the question of loss in any year cannot be ascertained without a consideration of the amount thereof justly attributable to that period of time, says: "The history of section 234 (a) (7) discloses a legislative purpose that the amount reasonably attributable to each year on account of obsolescence of tangible property used in the taxpayer's business is to be taken into account in ascertaining his taxable income. * * * Section 234 (a) (7) and other provisions of the same substance have been generally, if not uniformly, held to apply to obsolescence of tangible property, whatever its cause, where the amount fairly attributable to the tax year has been shown. * * * The statute contemplates annual allowance for obsolescence just as it does for exhaustion, wear, and tear. That is necessary in order to determine true gain or loss because postponement of deductions to cover obsolescence until the property involved became obsolete would distort annual income." This case clearly substantiates the theory that section 234 (a) (7) supra relates to a taxable year. The same may be said of Burnet v. Niagara Falls Brewing Co., 282 U. S. 648, 654, 51 S. Ct. 262, 264, 75 L. Ed. 594, where the court says: "Clearly the statute contemplates that, where warranted by the facts, the taxpayer shall have the benefit of, and in making his return may deduct in each year, a reasonable allowance to cover obsolescence of the tangible property. And that is in accord with sound principles of accounting. * * * Neither the cost of obsolescence nor of accruing exhaustion, wear, and tear that is properly chargeable in any period of time can be measured accurately. A reasonable approximation of the amount that fairly may be included in the accounts of any year is all that is required." This court points out that the purpose of allowing obsolescence under

said section is "to guide the ascertainment of taxable income in *each year.*" (Italics ours.)

In Burnet v. Thompson Oil & Gas Co., 283 U. S. 301, 305, 306, 51 S. Ct. 418, 420, 75 L. Ed. 1049, the Supreme Court was dealing with subdivision (9) of section 234 (a) of the Revenue Act of 1918, while here we are concerned with subdivision (7) of the same section. Subdivision (9) does not use the term "taxable year," but the court seemed to assume that it relates to such year and paid no particular attention to that question. We quote from the decision as follows: "It is evident that the act of 1913 did not allow enough to return the capital on exhaustion of the reserve. The deduction permitted by that act fell some $85,000 short of what was required in 1913–1915 for that purpose. Was it then the intent of the act of 1918 to permit a deduction from gross income for depletion which would represent not only that year's sustained depletion, but make up for sustained but disallowed depletion in the earlier years? The Government says, and we think rightly, that there is nothing in the terms of the act to indicate any such purpose. The tax is an income tax for 1918, and in the absence of express provision to the contrary, it is not to be supposed that the taxpayer is authorized to deduct from that year's income, depreciation, depletion, business losses or other similar items attributable to other years. The very fact that Congress denied deductions equal to the sustained depletion in the earlier years negatives an intent that they should be allowed in later years, as if for depletion then sustained. The construction adopted by the court below in effect results in including in the taxable year items referable to other years, and is contrary to the theory of a tax for specific years." In Earle v. Commissioner of Internal Revenue (C. C. A.) 38 F.(2d) 965, 968, the court said: "Any contention that net income for the taxable year 1923 would be wiped out by losses expected in future years is untenable. Income taxes are levied upon the net income for an annual accounting period. Gains in one period may not be offset by losses in another; therefore there was no deductible loss in 1923 unless it was sustained when partnership assets were exchanged for corporate stock." In De Loss v. Commissioner of Internal Revenue (C. C. A.) 28 F.(2d) 803, 805, the court said: "Indeed, the language forbade this, for he could charge off a loss only in the year when it was ascertained. Although it is, of course, true that any one is entitled to spread his losses as best he can in order to reduce his taxes, in inter-preting the law we are not to assume that a system based upon yearly gains and losses was so contrived as to admit deviations in principle which must always operate to the taxpayer's advantage. The express exceptions introduced in 1921, allowing such a practice, are to be taken as ex gratia, and indicate no analogous implied intent in the earlier statute."

What effect does the permission of the Interstate Commerce Commission that one-fifteenth of the cost of the abandoned property should be charged to operating expenses in each of the two taxable years have? Petitioner claims this action was conclusive upon it and upon respondent, and that such charge to operating expenses was an addition to the reserve for the restoration of capital assets lost through the abandonment of the line. The amount restored to capital is not what petitioner is entitled to deduct—it is the loss occurring during the taxable years by obsolescence or abandonment. The requirement that the loss due to abandonment of petitioner's line be charged to operating expenses was contested by petitioner in an action brought to have the regulation of the Commission relative to the method of keeping the accounts declared invalid and to enjoin enforcement thereof. In this petitioner failed.

In the case of Interstate Commerce Commission v. Goodrich Transit Co., 224 U. S. 194, 32 S. Ct. 436, 56 L. Ed. 729, the court held section 20 of the act to regulate commerce known as the Hepburn Act (49 USCA § 20) constitutional, and under this section the Commission had broad power to prescribe the forms of accounts and records to be kept by common carriers, and the act made it unlawful for the carrier to keep any accounts other than those prescribed by the Commission.

Petitioner's contention that the action of the Commission requiring it to charge one-fifteenth of the cost of abandoned property yearly to operating expenses for fifteen years was a conclusive holding that one-fifteenth of the cost was a reasonable allowance for obsolescence in each of said years 1918 and 1919, and that such allocation was conclusive, would, if sustained, give tremendous powers to the Commission and practically enable it by an accounting regulation to determine deductions in the amounts to be found as a basis for income taxes. It is to be noted that the Commission does not attempt to command this spread of obsolescence, but merely permits it as an accounting

proposition. The Commission did not purport in requiring the loss for abandonment to be charged to operating expenses to provide any standards for tax authorities to follow. This would be beyond its province. It could not make replacement value for tax deduction purposes the proper criterion of loss through obsolescence, nor make the yearly restoration to capital required by the Commission a loss through obsolescence for the particular year. Systems of accounting for railroads under the control of the Commission cannot interfere with the government's system of taxation. The Commission has no power to direct how the Revenue Laws of the United States shall be interpreted or by its orders provide standards to govern the taxing authorities.

 It is urged with considerable plausibility that these charges to operating expenses represent restorations to capital and are therefore not subject to income taxation. Of course restorations of capital assets are not taxable income. Doyle v. Mitchell Bros. Co., 247 U. S. 179, 38 S. Ct. 467, 62 L. Ed. 1054; Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570. Petitioner cites Edwards v. Cuba Railroad Co., 268 U. S. 628, 45 S. Ct. 614, 69 L. Ed. 1124, which was a case where subsidies were granted by the Cuban government to the taxpayer for the construction of a railroad in Cuba. It was held these were reimbursements for capital expenditures and not taxable income within the meaning of the Sixteenth Amendment. The advances were made under an agreement that they were to be returned to the taxpayer in the form of subsidies from the Cuban government. Of course those subsidies were not operating revenues, but here the revenues were the operating revenues of the railway. General charges, expenses and dividends could be paid out of them. They were not merely restorations of capital, they were clearly the income of the company, and the fact that they were to be used in part to restore past losses to the business would not change their taxable character. In United States v. S. S. White Dental Manufacturing Co., 274 U. S. 398, 47 S. Ct. 598, 71 L. Ed. 1120, the taxpayer in 1918 suffered a loss of its entire investment in a German subsidiary corporation through the seizure of its assets by the German government. It provided in 1918 a reserve to meet this at the rate of $15,000 quarterly, but the taxpayer was allowed to deduct the entire loss in its tax return for 1918, which holding carries a strong inference that in determining

the year and amount for which deduction is to be allowed the time and the amount of restoration of capital is not the controlling feature, but the time and amount of the capital loss. On this general subject of obsolescence the Board of Tax Appeals said: "The allowance for exhaustion, wear and tear of property or obsolescence thereof as provided for in section 234 (a) (7), supra, is an annual deduction and is based upon the exhaustion sustained during the taxable year in question. Morris & Bailey Steel Co. v. Commissioner, 9 B. T. A. 205. Clearly there is no exhaustion sustained during the taxable year on an asset which was abandoned or scrapped long prior thereto. The revenue acts provide for a deduction in the year in which the asset was discarded. Evanston National Bank, 1 B. T. A. 9; The Winter Garden, Inc., v. Commissioner, 10 B. T. A. 71; Dilling Cotton Mills, 2 B. T. A. 127. The respondent's determination in this particular must, therefore, be sustained." The obsolescence claimed did not occur during the tax years 1918 and 1919. Not a penny of value was taken from the property by obsolescence during those years. The property had become obsolescent long prior to that. The obsolescence of 1912 or previous years could not be carried forward and used as a basis of tax reduction in 1918 and 1919. The regulations of the Interstate Commerce Commission as to accounting had no effect on the situation as to taxation. The burden of proof was on the petitioner to establish his claim for a deduction. Burnet v. Houston, 283 U. S. 223, 51 S. Ct. 413, 75 L. Ed. 991; United States v. Anderson, 269 U. S. 422, 46 S. Ct. 131, 70 L. Ed. 347; United States v. Mitchell, 271 U. S. 9, 46 S. Ct. 418, 70 L. Ed. 799. It has failed to sustain said burden.

 The second point urged is the alleged error of the Board of Tax Appeals with relation to the claimed deductible loss sustained by petitioner in taking over the homes of its employees at Mena, Ark., through the instrumentality of the Mena Company. This claim is under section 234 (a), subdivision (4), Revenue Act of 1918, which is as follows:

"Sec. 234. (a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions: * * *

"(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise;" 40 Stat. 1077, ch. 18.

We devote little time to this question.

The Board not only found there was not a deductible loss for 1919, but that there was a profit because the Mena Company had in 1919 sold its stock for $40,000, when the original amount represented by the stock was $25,000. Respondent concedes that the Board erred in finding there was a taxable gain arising out of this transaction, and concedes that petitioner is correct in its contention that the Board should have considered the entire transaction instead of merely considering capital stock. It admits error in the reasoning of the Board in disallowing the alleged loss. Respondent does not seriously question the right of petitioner to have a deduction for this loss, but insists that under the condition of this record, in the absence of proof as to the value of the capital stock of the subsidiary on March 1, 1913, and of the accounts receivable owed by the subsidiary to the parent company, there is no evidence on which to base any loss. That petitioner was entitled to some deduction cannot well be denied. United States v. S. S. White Dental Mfg. Co., supra. In United States v. Flannery, 268 U. S. 98, 45 S. Ct. 420, 422, 69 L. Ed. 865, it is held that where an actual gain was derived or an actual loss sustained from the investment the provision with reference to the market value on March 1, 1913, as the basis of estimating such loss is applicable. The court says: "We think it should be held that the Act of 1918 imposed a tax and allowed a deduction to the extent only that an actual gain was derived or an actual loss sustained from the investment, and that the provision in reference to the market value on March 1, 1913, was applicable only where there was such an actual gain or loss, that is, that this provision was merely a limitation upon the amount of the actual gain or loss that would otherwise have been taxable or deductible." In the present case considering the transaction in its entirety the investment was shown to be $162,833.84. The receipts from the transaction, including the sale of the stock, which was the method of transferring the property, was $74,890.95, and petitioner claims therefore there was a loss sustained of $87,942.89. In view of the decision in the Flannery Case, there being a loss shown here between the investment, which was made prior to March 1, 1913, and the sale of the stock, to figure the loss the investment value of March 1, 1913, must be taken into consideration and the difference between the original investment and the amount for which liquidation was finally made, is not the proper measure of the deduction allowable. The measure should

be the difference between the investment value of March 1, 1913, and the amount for which the improvement company was finally liquidated. There is no evidence whatsoever upon which to base any finding on this subject. We are not compelled, however, for that reason to sustain a clearly erroneous finding of the Board of Tax Appeals. Under section 1226, title 26, USCA, referring to the power of the reviewing court, subdivision (b) provides: "Upon such review, such courts shall have power to affirm or, if the decision of the board is not in accordance with law, to modify or reverse the decision of the board, with or without remanding the case for a rehearing, as justice may require. (Feb. 26, 1926, c. 27, § 1003, 44 Stat. 110.)" We therefore feel that justice in this matter requires a reversal of the finding of the Board of Tax Appeals on this question and a remanding to said Board for an allowance to petitioner of a proper legal deduction.

The third point urged by petitioner is that the amounts paid it by the government as compensation for the use of its property during the period of federal control is not subject to income tax for the reasons: (a) That such compensation does not constitute taxable income under the standard and accepted definition of income taxable under the Sixteenth Amendment; (b) that under the Fifth Amendment to the Constitution the government guaranteed to petitioner the full and perfect equivalent of the value of the use of its property during federal control, and that the imposition of a tax on the amount received for the value of said use would so reduce compensation that it would not constitute just compensation.

Was the amount received by petitioner from the government taxable income? Such income has been defined by the courts as consisting of gain derived from capital, from labor, or from both combined. Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570. Petitioner contends that the full equivalent of the value of the use of its property does not contain any element of gain or profit. Had the government not taken over petitioner's railroad, it would have received its customary income from performing its duties as a common carrier. The test period from July 1, 1914, to June 30, 1917, fairly showed what its income would be, and this was used as a basis for settlement. Of course what the government had was a temporary use of the property as a war expedient, which use was surrendered after said period. The government paid

for the use of the property. Capital assets were not taken. This payment for use was gain derived from invested capital just as much as if rental had been paid therefor under a lease to private concerns. We have no doubt that the amount received by the railroad from the government for the use of its properties was a gain derived from capital, and hence income.

The second proposition that the just compensation paid is reduced by the tax attempted to be assessed—hence the railroad company does not receive just compensation and therefore the Fifth Amendment to the Constitution of the United States is violated —is interesting and novel. In all the dealings between the government and the railroads concerning compensation for taking over their use during the war period this question does not seem to have arisen. It is conceded by respondent that the properties were taken by the government in the exercise of a power similar to that of eminent domain rather than in the nature of a lease. North Carolina Railroad Co. v. Lee, 260 U. S. 16, 43 S. Ct. 2, 67 L. Ed. 104. Of course petitioner was entitled to just compensation therefor. The Fifth Amendment to the Constitution provides that private property shall not be taken for public use "without just compensation." This is a fundamental proposition in any just government. Seaboard Air Line R. Co. v. United States, 261 U. S. 299, 43 S. Ct. 354, 67 L. Ed. 664; Brooks-Scanlon Corp. v. United States, 265 U. S. 106, 44 S. Ct. 471, 68 L. Ed. 934.

The measure of just compensation is clearly set forth by the court in Seaboard Air Line Ry. v. United States, 261 U. S. 299, 43 S. Ct. 354, 356, 67 L. Ed. 664. It says: "The compensation to which the owner is entitled is the full and perfect equivalent of the property taken. Monongahela Navigation Co. v. United States, 148 U. S. 312, 327, 13 S. Ct. 622, 37 L. Ed. 463. It rests on equitable principles and it means substantially that the owner shall be put in as good position pecuniarily as he would have been if his property had not been taken." The obligation of the government to compensate the owner in taking over the properties of the railroads during the war period was one arising out of an implied obligation to make just compensation. In Phelps v. United States, 274 U. S. 341, 343, 344, 47 S. Ct. 611, 612, 71 L. Ed. 1083, the court said: "Under the Fifth Amendment plaintiffs were entitled to just compensation, and, within the meaning of section 145 [28 US CA § 250], the claim is one founded on the Constitution. Moreover, it has long been established that where, pursuant to an act of Congress, private property is taken for public use by officers or agents of the United States, the government is under an implied obligation to make just compensation. That implication being consistent with the constitutional duty of the government as well as with common justice, the owner's claim is one arising out of implied contract. * * * The government's obligation is to put the owners in as good position pecuniarily as if the use of their property had not been taken. They are entitled to have the full equivalent of the value of such use at the time of the taking paid contemporaneously with the taking." Here the adjustment for value of the use was made by the Director General of Railroads and petitioner. The amount to be paid by the government for the use of petitioner's property was agreed on and interest added to the date of payment, which was the full equivalent of the value of the use at the time of the taking. Petitioner received its just compensation, but now claims that by taxation of the same by the government the Fifth Amendment was violated, in that the compensation was so reduced that it did not constitute just compensation; that the tax relates back and reduces the amount of the concededly just compensation which had been paid. Respondent argues that the compensation authorized by section 1 of the Federal Control Act (40 Stat. 451) took into consideration the fact that such compensation would be subject to federal income taxation and that section 230 (b) of the Revenue Act of 1918 (40 Stat. 1057, 1075) in effect prior to the time when the compensation was finally liquidated must be considered in connection with the Federal Control Act. It specifically refers to railroad corporations which had entered into agreements with the Director General of Railroads for operation of their properties during federal control. Section 1 of the Federal Control Act relates to railroad corporations which had made agreements for operation of their properties during the period of federal control. No formal agreement was entered into in this case. Section 12 of said act relates to those corporations whose property was taken without a contract, which covers this situation. Section 230 (a) and (b) of the Revenue Act of 1918 are as follows:

"Sec. 230. (a) That, in lieu of the taxes imposed by section 10 of the Revenue Act of 1916, as amended by the Revenue Act of

1917, and by section 4 of the Revenue Act of 1917, there shall be levied, collected, and paid for each taxable year upon the net income of every corporation a tax at the following rates:

"(1) For the calendar year 1918, 12 per centum of the amount of the net income in excess of the credits provided in section 236; and

"(2) For each calendar year thereafter, 10 per centum of such excess amount.

"(b) For the purposes of the Act approved March 21, 1918, entitled 'An Act to provide for the operation of transportation systems while under Federal control, for the just compensation of their owners, and for other purposes,' five-sixths of the tax imposed by paragraph (1) of subdivision (a) and four-fifths of the tax imposed by paragraph (2) of subdivision (a) shall be treated as levied by an Act in amendment of Title I of the Revenue Act of 1917."

These sections show the intention of Congress to tax such corporations while under federal control 2 per cent. less than would be imposed on corporations not under such control. Respondent contends that the Federal Control Act and these sections co-ordinate and interlock and tend to show that compensation was intended to be put at such figure as to permit a tax which would not reduce the ultimate result below just compensation. The argument is not clear, but it is apparent that the 2 per cent. normal tax under the Revenue Act of 1916 is remitted under the Revenue Act of 1918 as to corporations taken over by the government for the war period. This does not reach the main question, for if a tax on the just compensation as income reduced the same so as to violate the Fifth Amendment, the fact of the degree of reduction would be unimportant. Of course if the compensation is put so high that after payment of the tax the amount remaining would constitute just compensation the tax question would be eliminated. The argument of respondent as to these particular statutes is not particularly convincing.

The settlement here was of a voluntary character, yet if it be considered that the property was forcibly taken we do not think petitioner's position is sound. It is not disputed that the amount agreed upon as compensation was just, and applying the rule of the Seaboard Air Line Railway Co. v. United States Case, supra, how can it be claimed that petitioner was not in as good situation pecuniarily even after payment of the taxes as it would have been had the property not been taken. If it had kept the property and operated it, its income therefrom would have been subject to government taxation, and its net income would have been reduced by the amount it so paid. If it had leased the property for the same amount that the government paid, it would have had to pay government taxes on the amount received as rental. If the theory of petitioner is correct, the government would have to pay more for the use of property taken as a war measure than if the same had been leased to private individuals. Compensation is unjust when the government is compelled to pay more for the use of property than the highest amount of rental that could be secured for such use. If the property were taken never to be returned it could well be argued that the amount received was not income and not subject to income tax, but by whatever terms the transaction may be designated, it was a taking over of property for a temporary use and petitioner was paid a just compensation for said use. Compensation was determined and paid and the transaction was consummated prior to the time of any tax being collected thereon. Immunity from taxation would increase the compensation received in excess of that authorized by the Federal Control Act. The theoretical possibility of attempting to take back all of the just compensation by taxation is not alarming enough to be considered before such situation arises. There is no support for respondent's position in the cases cited, except in Evans v. Gore, 253 U. S. 245, 40 S. Ct. 550, 64 L. Ed. 887, 11 A. L. R. 519, and Miles v. Graham, 268 U. S. 501, 45 S. Ct. 601, 69 L. Ed. 1067. Most of the cases cited were decided on the ground of interference by the state with agencies of the national government or interference by the national government with state agencies. Evans v. Gore and Miles v. Graham, supra, were decided under the provisions of article 3, section 1, of the Constitution dealing with the judicial power of the United States which provides that the Judges of the Supreme Court and inferior courts shall "receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." The language of this section is not the same as the language of the Fifth Amendment to the Constitution regarding just compensation. We think these cases, while important, are not exactly in point in this case, nor controlling. The court might have reached a different conclusion if the language of section 1, article 3, was that judges should receive for their services a "just compensation," instead of "a com-

382

pensation which shall not be diminished during their continuance in office." We are not willing to hold that just compensation to be paid by the government for the use of property temporarily taken in a war emergency must be more than the railroad could secure from other parties for the use of the same property. We do not understand the constitutional provision as to just compensation for property taken to so require, and certainly no principle of justice demands it.

In our judgment the Board of Tax Appeals was correct in its decision on the first and third propositions in refusing the deductions claimed for obsolescence for the years 1918 and 1919 and in holding that the amount received by petitioner for the use of its property was taxable income. As to the second proposition concerning a deduction for the loss in the Mena transaction, we have already indicated our view. We affirm the action of the Board as to propositions 1 and 3. We reverse its judgment as to the second proposition and remand the case to the Board for further proceedings in harmony with the views herein expressed.

Affirmed in part, reversed in part, and remanded to the Board of Tax Appeals.