*Decisions will be entered under Rule 50.*

THE TOLEDO TERMINAL RAILROAD COMPANY, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 16526. Promulgated July 14, 1949.

*John J. Kendrick, Esq.*, and *G. Charles Scharfy, Esq.*, for the petitioner.

*Lawrence R. Bloomenthal, Esq.*, for the respondent.

66

68

ARUNDELL, *Judge*: The sole question herein concerns the proper amount deductible by petitioner as depreciation on its rolling stock in the calendar years 1942, 1943, and 1944. The parties agree that the method we prescribe herein for determining depreciation in those years will be followed in 1945 and 1946 and will be determinative of a net operating loss in 1946 and a net operating loss carry-back from that year to 1944.

Petitioner had used a composite system of determining its annual allowance for depreciation from its inception in 1907 until 1935. From 1907 to 1920 it used a rate of 2 per cent and from 1920 to 1935 a rate of 4 per cent on its rolling stock *as a class*. In 1935, pursuant to an order of the Interstate Commerce Commission, it adopted a method whereby it depreciated its rolling stock according to five separate classifications, each with a separate rate.

In accord with the Commission's rules and regulations, petitioner maintained in its general ledger a "control" account, numbered 701, for all its rolling stock, which disclosed the aggregate cost basis and accrued depreciation on all classes of rolling stock. It also kept in its general ledger and subsidiary accounts, records pertaining to each class of equipment which disclosed the cost, composite rate, and accrued depreciation on each class of property. In addition to the above accounts, which were required by the Interstate Commerce Commission, it kept "side" or collateral records which showed, for its own management purposes, the amounts of depreciation attributable to each individual item of equipment.

It appears that in each year petitioner would compute the allowable depreciation under the rate fixed by the Interstate Commerce Commission for each class of equipment and carry over the aggregate to the over-all depreciation reserve in its "control" account. When a unit of its equipment was retired, the investment account was decreased by the original cost of the unit, the salvage realized was credited to an appropriate asset account, and the difference between cost and salvage was eliminated from its depreciation reserve. No gains or losses with respect to such retirements have ever been claimed by petitioner in its Federal tax returns. This system appears to have complied with the procedure for depreciable property account set out in Bulletin "F."[1]

---

[1] *Additions and reductions.*—The depreciable asset account should be charged with the cost or other basis of all depreciable property acquired, and credited with the cost or other basis of all assets disposed of through sale, retirement, abandonment, casualty, or otherwise.

*Depreciation reserve.*—This account should be credited with depreciation and obsolescence allowed or allowable, whichever is greater, in each taxable year. The full cost or other

Respondent had tacitly approved this method of computing depreciation for tax purposes prior to 1942, and even now does not appear seriously to challenge its propriety for a business such as petitioner conducts. The difference between the parties is essentially over the extent to which such a procedure may be carried.

The principal controversy herein arises from the fact that under the method used by petitioner at least two classes of its equipment, namely, "steam locomotives" and "miscellaneous equipment" would by the end of 1946 be overdepreciated in that petitioner would by that time, applying the rates prescribed by the Interstate Commerce Commission, have recovered by way of depreciation more than the original cost of the equipment in these accounts.

For this reason respondent, on the basis of petitioner's collateral records which disclosed the amount of depreciation attributed by petitioner to each piece of equipment, recomputed the allowable depreciation for the years 1942 to 1944, inclusive, by determining for each individual item of its rolling stock the remaining or unrecovered cost, an estimated salvage value, and an estimated remaining life. In short, respondent completely abandoned the composite system and based depreciation in those years on the straight-line unit or item method of depreciation. In this respect, we believe respondent was clearly in error. A recognized system, once established and operative over a long period of years, should not be abandoned unless there is a cogent reason for a change. *Lake Charles Naval Stores*, 25 B. T. A. 173; *Copifyer Lithograph Corporation*, 12 T. C. 728. In our opinion, any adjustments to depreciation necessary in the instant case may be accomplished by a determination of new rates for the respective groups, a procedure which is in harmony with the system used by petitioner.

Petitioner, on the other hand, claims that it may properly recover more than its original cost on its various classes of equipment so long as in its "control" account its depreciation reserve, representing the accrued depreciation on all classes, does not exceed the original cost of

---

basis of all normal retirements adjusted for salvage should be charged to the account. When assets are sold, transferred, or retired because of casualty or special obsolescence, the account should be charged only with the depreciation and obsolescence accrued.

*Salvage.*—* * * In principle, the estimated net salvage should serve to reduce depreciation, either through a reduction in the basis on which depreciation is computed or a reduction in the rate. In either instance the amount of net salvage should actually, or in effect, be a credit to the depreciation reserve. * * *

* * * * * * *

*Losses.*—Accounting losses from the normal retirement of assets are not allowable under any method of depreciation accounting unless, in the case of classified or group accounting, the depreciation rate is based on the expected life of the longest-lived asset in the group, and in item accounting only when the maximum expected life of the asset is used, since correct item accounting requires an accurate determination of the life of each individual asset, which is a practical impossibility until near the end of its life.

Losses resulting from casualty are allowable in the year when the casualty occurred.

its entire rolling stock. Petitioner bases this argument on the premise that the depreciation accounts it has maintained since 1935 are of the type characterized as "composite accounts" [2] by Bulletin "F." However, a distinction exists between petitioner's system and "composite accounts" in that all of its depreciable assets were not included in one account and no over-all composite rate was applied to the cost or other basis of petitioner's entire depreciable property. Petitioner computed its depreciation by simply adding the depreciation computed under the separate rate for each of its five classes of equipment and on its general ledger credited the aggregate to its over-all depreciation reserve. Under our interpretation of the language of Bulletin "F" outlining the various depreciable property accounts available to taxpayers, petitioner's method more closely conforms to the so-called "group accounts." [3]

Petitioner, citing *Union Co.*, 14 B. T. A. 1310, states that "it is *implicit* in composite depreciation accounting that the composite rate is an *average* rate, and that if such rate would be applied to the longer-lived individual units in the composite category, such units would be fully depreciated prior to the termination of their actual useful life, while conversely the shorter-lived assets would no longer be in use at a time when depreciation would still continue to be taken on them. It is the experience of the *group* which is important   *   *   *."

Insofar as the principle stated by petitioner is concerned, we have no doubt that it is correct. However, we find that as of the end of 1946 "Steam Locomotives" and "Miscellaneous Equipment," as *groups*, have been overdepreciated, petitioner on that date having recovered, by way of deductions for depreciation on its tax returns, amounts in excess of the original cost of the assets in each group.

Within the group it is possible, in fact necessary if an average life instead of a maximum life is used in computing the rate, that some individual items are "over-depreciated" to compensate for similar

---

[2] *Composite Accounts.*—All depreciable assets are included in one account with a single depreciation reserve. In computing depreciation an over-all composite rate is applied to the cost or other basis of all depreciable property. The depreciation rate is determined by applying the appropriate component rate to the cost or other basis of each classification or group included in the composite account and dividing the total amount thus obtained by the total cost of all depreciable property. Under this method, it is necessary to redetermine the composite rate whenever substantial changes occur in the relative proportions of different groups of assets. The method has the merit of extreme simplicity in application, and if the rate is adjusted to material changes in composition of the plant account, it is acceptable.

[3] *Group Accounts:* Assets similar in kind which have approximately the same average useful lives are included in one account. This method is considered accurate and satisfactory for use in determining depreciation allowances, especially where large investments in depreciable property, containing many items of widely differing estimated useful lives, are involved. A separate reserve is carried for each group and computation of depreciation is simplified since the same depreciation rate is applicable to all items in the group. The greater the number of items that, because of life characteristics, fall in the same group, the more accurate are the results.

items in the class which are retired prior to the estimated average useful life of the group. It is for this reason that where a rate is based on an average life of the group, no loss is allowed on a premature retirement. However, we do not believe that a class of assets may be overdepreciated merely because many of its composite units remain in service after the original cost of the class has been completely recovered or because there exist other groups or classes depreciated at different rates where complete cost has not yet been recovered. *Alpin J. Cameron*, 8 B. T. A. 120, 129; affd., *Cameron* v. *Commissioner*, 56 Fed. (2d) 1021. Cf. *Pittsburgh Brewing Co.*, 37 B. T. A. 439; reversed on another point, 107 Fed. (2d) 155. The inevitable result of allowing petitioner to continue depreciation at the normal rates on these classes would be to overdepreciate the "other locomotives" account as, upon the retirement of the overdepreciated classes, all of the excessive depreciation taken in respect thereto would remain in the depreciation reserve.

Since 1935 petitioner has computed its depreciation for tax purposes under the method and rates prescribed by the Interstate Commerce Commission. The fact that such procedure is generally acceptable to the respondent is shown by the following language of Bulletin "F":

.2866 *Steam railroad property.* In general, the rates of depreciation of physical property of common carriers by rail under the jurisdiction of the Interstate Commerce Commission will be governed by the action taken by the Commission in its application of the provisions of section 20, paragraph 5, of the Interstate Commerce Act, as amended by the Transportation Act of 1920. However, the basis of depreciable property must conform to the limitations of cost or other allowable value as prescribed by the Internal Revenue Code.

However, it is clear that the respondent is not bound to abide by the method used to compute depreciation for the purposes of the Interstate Commerce Commission. *Old Colony R. Co.* v. *Commissioner*, 284 U. S. 552; *Atlantic Coast Line R. Co.*, 31 B. T. A. 730; affd., 81 Fed. (2d) 309; certiorari denied, 298 U. S. 656. The Interstate Commerce Commission, for its own purposes, adjusted petitioner's allowance for depreciation in 1946 by assigning new and lower rates on each class of equipment and transferring $70,000 of the depreciation accrued on its various classes of rolling stock to the depreciation account for its "road" properties. The transfer of the $70,000 between accounts did not represent a retroactive reduction in depreciation, but merely a shifting of depreciation between petitioner's primary group accounts. The petitioner was instructed by the Commission to retain this amount as "a margin against unforeseen retirements."

Although a revision of this nature effectuates the purposes of the Interstate Commerce Commission, it clearly does not offer a solution to the tax problem involved, which requires an annual determination of

a "reasonable allowance" for depreciation which the petitioner may use as a deduction in computing its Federal tax liability. Therefore, it is our opinion that the amount of depreciation to which the petitioner is entitled in the years in issue must be determined solely on the basis of the evidence presented in the instant proceeding.

The record before us demonstrates that by the end of 1946 petitioner's rolling stock, exclusive of its newly acquired diesel-electric locomotives, had reached the end of its economic useful life. Although the record shows that it possessed some usefulness and in fact was used by the petitioner after that date, it is not an uncommon experience to find property fully depreciated for tax purposes used to some extent after the expiration of its estimated useful life. This is especially true in the instant case, where obsolete equipment was and is being used on an emergency or rotating basis and in many instances for purposes other than those for which it was designed. Inasmuch as most of petitioner's rolling stock was approaching the end of its useful life during the years before us, it is not surprising to find that its depreciation reserves on such classes of equipment had reached a point approximating its original cost.

Although our decision herein will permit the petitioner to deduct, with the exception of the "Miscellaneous Equipment" account hereinafter discussed, depreciation in the amount claimed for each group of equipment in 1942, 1943, and 1944, it may not in later years continue to claim depreciation on a group once it has recovered the full amount of the original cost thereof by way of deductions taken in its Federal income tax returns.

From the evidence herein, it is also clear that the useful life of the automobile carried in the "Miscellaneous Equipment" account was greatly underestimated, which resulted in the selection of an excessive rate. This fact is evidenced by the ratio of the depreciation reserve to the original cost of the property in 1942 and the continued use and overdepreciation of the property after that date. The proper remedy in such a case is to reduce the rate so that recovery of cost will more closely conform with what experience has shown to be the actual exhaustion of the property. We are of the opinion that the composite rate of 13.33 per cent fixed by the Interstate Commerce Commission in 1946, if applied to the "Miscellaneous Equipment" account for 1942 and subsequent years until such time as its original cost is recovered, would result in a reasonable allowance for its depreciation.

To permit a recomputation of petitioner's tax liability for the years 1942, 1943, and 1944, inclusive, in accordance with our opinion herein,

*Decision will be entered under Rule 50.*