Argued April 1, affirmed September 5, 1968

# EQUITABLE SAVINGS & LOAN ASSOCIATION, *Respondent and cross-appellant, v.* STATE TAX COMMISSION, *Appellant and cross-respondent.*

444 P. 2d 916

*Gerald F. Bartz,* Assistant Attorney General, Salem, argued the cause for appellant and cross-respondent. With him on the briefs were Robert Y. Thornton, Attorney General, and Alfred B. Thomas, Assistant Attorney General, Salem.

*William E. Love,* Portland, argued the cause for respondent and cross-appellant. On the brief were John R. Faust, Jr., and Cake, Jaureguy, Hardy, Buttler & McEwen, Portland.

Before Perry, Chief Justice, and McAllister, Sloan, O'Connell, Goodwin, Holman and Langtry,* Justices.

McALLISTER, J.

This appeal by the State Tax Commission from a decree of the Oregon Tax Court involves the right of

* Langtry, J., did not participate in this decision.

the plaintiff to apportion its income between Oregon and other states in which it is engaged in business or carries on activity. The following statement of the controlling facts is taken almost verbatim from the opinion of the tax court, 3 OTR Adv Sh 9 (1967).

The plaintiff is a savings and loan association specializing in making improved real estate loans and has its headquarters office in Portland. Plaintiff has twenty-two branch offices in Oregon, four in Washington and one in Idaho. Plaintiff's business activities are becoming increasingly centralized in Portland because of the necessity of maintaining control over an expanding operation. All loan applications are submitted to the loan committee in Portland for its approval. Payroll and employee records are maintained, auditing and advertising and central accounting conducted, and all of plaintiff's business control is centralized in the Portland headquarters.

Plaintiff has been doing business in Washington since 1899 and has branch offices in Seattle, Tacoma, Spokane and Yakima. These offices originated and processed their own mortgage loans with final approval made by the loan committee in the Portland office. Plaintiff does not have an office in Vancouver, Washington, but does a substantial business in Clark county, of which Vancouver is the county seat. Until approximately six years ago plaintiff employed a solicitor who solicited and processed all Clark county loans. Thereafter the loans were solicited and processed by a chief appraiser who lives in Vancouver. Most of the loans are builder's loans which are solicited and processed on the job but occasionally the loan documents are executed in the Portland office. During the years involved plaintiff averaged approximately

six million dollars in outstanding loans in the southwestern Washington area, which includes Clark county.

Plaintiff has been qualified to do business in Idaho since 1906. The Idaho loans are made through approximately fifteen loan agents who are local men in the real estate and insurance business and receive a finder's fee from plaintiff for making the loans. They solicit the loans, prepare the applications and credit reports, make the appraisals and send all documents to the Portland office for approval. The loan documents are signed in Idaho and the funds are disbursed by the agent to the borrowers. Collections are also made by the agents. Plaintiff had approximately $450,000 to $500,000 in outstanding loans in Idaho.

Plaintiff's California loans originated almost entirely through brokers, mostly in the Los Angeles area. Plaintiff made two types of loans in California—straight loans and participation loans. In the former plaintiff was the direct lender and would receive a note and mortgage from the borrower. On these loans plaintiff would have the property appraised and the loan committee from Portland also inspected the property. Plaintiff had about five million dollars outstanding in straight loans in California. In the participation loans plaintiff would purchase a percentage of the loans that a mortgage broker or savings and loan association offered to sell. Plaintiff's officials would check over the credit reports and the appraisal, inspect the property and the area involved and, if satisfied, buy a percentage of the loan. The local association would service the loan, handle the collections, delinquencies and forclosures, if any. Plaintiff had approximately six million dollars outstanding in California participation loans.

During the years 1961 to 1963 plaintiff held a loan on a cooperative apartment in Hawaii. Plaintiff was advised of the possibility of the loan through a Los Angeles broker. One of the members of plaintiff's loan committee made an on-site inspection, checked the location of the apartment, the sale of the units, met with the architect and contractor, and the committee approved the loan in the amount of $1,760,000. The loan was closed in Hawaii and a local organization made the collections and serviced the loan.

The final out-of-state loans involved are denominated Capehart loans. This loan program was established by the federal government to finance the construction of housing for the families of military personnel around large military bases. The loans made by plaintiff and other similar organizations were interim construction loans which were eventually taken over from the plaintiff by the Federal National Mortgage Association after the construction was completed. The loans originated and were closed in Washington, D. C. Plaintiff's officers made several inspection trips to observe the progress of the construction of the various projects in which it was interested. During the three years Equitable was participating in the program it had approximately one hundred million dollars involved in Capehart loans.

The plaintiff paid under protest corporate excise taxes imposed by ORS 317.060 for the years 1958 through 1962. It then sued in the tax court for a refund, claiming the right to apportion its income pursuant to ORS 314.280 between Oregon and the other states in which it was engaged in business. The tax court granted the refund, and the commission appeals.

■ The statute controlling the decision in this case

is ORS 314.280, which prior to its amendment in 1965 (1965 c. 152 § 22) read in pertinent part as follows:

ORS 314.280 "(1) If the gross income of a corporation or a nonresident individual is derived from business done both within and without the state, the determination of net income shall be based upon the business done within the state, and the commission shall have power to permit or require either the segregated method of reporting or the apportionment method of reporting, under rules and regulations adopted by the commission, so as fairly and accurately to reflect the net income of the business done within the state.

"(2) The provisions of subsection (1) of this section dealing with the apportionment of income earned from sources both within and without the State of Oregon are designed to allocate to the State of Oregon on a fair and equitable basis a proportion of such income earned from sources both within and without the state. * * *" [1957 c. 632 § 4]

The above statute clearly entitles plaintiff to apportion its income if that income is derived in part from business done in other states. The first inquiry then is whether plaintiff is doing business outside of Oregon within the purview of ORS 314.280.

We held in *Cal-Roof Wholesale v. Tax Com.*, 242 Or 435, 410 P2d 233 (1966), that nexus was sufficient to authorize apportionment under ORS 314.280, and that the out-of-state business need not qualify as "intrastate" business in order to entitle the taxpayer to apportion. The reasons for that holding are stated with clarity in the comprehensive opinion in *Cal-Roof Wholesale*, and need not be repeated here.

The question of the extent of activities necessary to constitute nexus also has been settled with finality by the definitive opinion in *Amer. Refrig. Transit Co.*

*v. Tax Com.*, 238 Or 340, 395 P2d 127 (1964). We held in that case that:

"The nexus exists whenever the corporation takes advantage of the economic milieu within the state to realize a profit. The state is entitled to tax if the benefits it provides are a substantial economic factor in the production of the taxpayer's income.
\* \* \* \* \*

"\* \* \* It is now firmly established that a state may tax the net income of a corporation engaged exclusively in interstate commerce. We would expect the United States Supreme Court to hold, as we do, that due process nexus is established even though the taxpayer has no offices or agents within the taxing state if it could be shown that Oregon's economy was a substantial economic factor in the production of the taxpayer's income subject to tax." (Footnotes omitted) 238 Or at 346, 350-1.

When the tests prescribed in *Cal-Roof Wholesale* and *Amer. Refrig. Transit* are applied to the plaintiff's out-of-state business, it is clear that plaintiff is entitled under ORS 314.280 to apportion its income. There can be no doubt that the "economic milieu" of the other states in which plaintiff engaged in business was a substantial factor in producing plaintiff's income in those states. The tax court properly so held.

■ We turn next to the question of apportionment. The commission's Reg. 4.280 requires that the in-state and out-of-state income of a unitary business be apportioned "by giving equal weight to three factors, i.e., 'property,' 'wages,' and 'sales.'" The regulation further provides that if substantially all of the income of a financial institution is in the form of interest, the factor of gross loans is substituted in the formula for the average value of real and tangible personal property, and the factor of gross interest collected is substituted in the formula for the factor of sales. The tax

court held that plaintiff's income should be apportioned pursuant to those regulations by applying the three factors of wages, gross loans and gross interest collected. The tax court held that the gross loans made to residents of another state and secured by property in that state, together with interest paid on those loans, should be apportioned to the other state. We agree with the tax court's construction of the statute and the regulations, and approve the apportionment formula in the decree of the court below.

■ Although the commission questions whether nexus is sufficient to authorize apportionment, and whether nexus exists between plaintiff and the other states in which it has engaged in business, the commission does not rest its case on those grounds. The commission's basic contention is (a) that plaintiff is a domestic corporation dealing in intangibles, (b) that the rule of *mobilia sequuntur personam* applies, and (c) that under that rule the commission can tax income from intangibles at the domicile of a domestic corporation. By this reasoning the commission attempts to avoid the consequences of apportionment by allocating all of the plaintiff's out-of-state income to Oregon.

Conceding that the maxim of *mobilia sequuntur personam* may be applicable under other circumstances, we think it is entirely irrelevant in this case. We are not concerned with how the legislature might tax the income from intangibles, but with how it has taxed corporate income from that source.

■■ The controlling factors are that the legislature since 1929 has directed that unitary income of a corporation be apportioned between the states in which it is earned, and has directed the commission to adopt rules and regulations to fairly and equitably accomplish that apportionment. The legislature made no exception for

income from intangibles. Pursuant to the command of the legislature, the commission promulgated regulations to accomplish the apportionment of the unitary income of a corporation. The regulations have provided since at least 1938 that as to financial institutions, their unitary income shall be apportioned by the three-factor formula of wages, loans and interest. There is no dispute in this case about the wage factor. It would be pure sophistry to now suggest that by gross loans the commission did not mean loans made in other states to residents thereof and secured by property in those states. The factor of "gross interest collected" obviously was intended to mean the interest paid on out-of-state loans.

◼ We think the tax court properly apportioned plaintiff's unitary income in accordance with the statute and the plain meaning of the commission's own regulations. If there is to be special taxation of the income from intangibles of a domestic corporation, it should be provided by the legislature and not initiated either by the commission or by this court.

◼ The next question raised by the commission is whether plaintiff is entitled to deduct as an ordinary and necessary business expense for the year 1962 certain premiums paid to the Federal Savings and Loan Insurance Corporation (FSLIC). We approve the holding of the tax court that plaintiff is entitled to deduct these additional premiums as a business expense, and we quote with approval the opinion of the tax court dealing with this issue:

"In 1960 the plaintiff's accounts became insured by the FSLIC, an agency of the federal government. For this insurance the plaintiff pays an insurance premium which is added to FSLIC's primary insurance reserve. The parties agree that

this premium has always been deducted by plaintiff as an ordinary and necessary business expense and is not involved in this case. Effective in 1962 Congress required all insured savings and loan associations to pay an additional premium over and above the regular premium in order to strengthen the FSLIC reserves. This premium is placed in a secondary insurance reserve, the earnings retained by FSLIC and the secondary reserve is available for the losses of FSLIC only to the extent the primary reserve is insufficient. Plaintiff can regain the sums paid into this secondary reserve if it liquidates and if FSLIC has them available.

"The Internal Revenue Service (Rev Rul 66-49, 1966-1 Cum Bull 36) has held that payments made to this secondary reserve account by savings and loan associations are not deductible.

"The Tax Commission relies upon the revenue ruling to deny the deduction of the secondary reserve premium payments. The Commissioner of Internal Revenue denied the deduction on the grounds that the savings and loan association paying the additional premium retained an interest in the secondary reserve fund which was returnable under certain circumstances. It would seem that the interest retained by the plaintiff would be contingent on the existence of the fund. The secondary reserve fund is maintained by the FSLIC to pay losses incurred by them and if the primary fund is depleted, the secondary reserve fund would be used to make up such losses.

"The plaintiff's payments into the FSLIC secondary reserve fund are comparable not only to the premiums paid into the primary fund, which are concededly deductible, but are also comparable to prepaid insurance premiums. Under the defendant's Reg 316.305(1)-(E) these premiums are handled as follows:

" 'Premiums paid on policies covering periods of more than one year may be deducted when paid by a taxpayer reporting on a cash basis but

must be prorated over the life of the policy by a taxpayer reporting on an accrual basis. When any part of a premium which has been deducted as expenses is returned to the insured, the amount refunded shall be included in the gross income of the year in which the premium is returned.'

"It has been stipulated that plaintiff is on a cash basis. Consequently, under the above regulation it is not required to prorate the premiums but may deduct them when paid.

"Plaintiff is required to pay both the primary and secondary premiums. The fact that it may receive some benefit from the secondary reserve some time in the future if certain events transpire should not affect its right to deduct both payments as an expense at this time. Under the regulation, *supra*, if plaintiff does receive such benefits in the future, the amount refunded will be included in gross income at that time." (Footnotes omitted) 3 OTR Adv Sh at 19-21.

■ The plaintiff has cross-appealed and contends that the tax court erred in holding that the plaintiff could not deduct, either as additions to a reserve for bad debts or as an ordinary and necessary business expense, sums which plaintiff is required by state or federal law to set aside as reserves for bad debts and real estate losses. We also concur in the holdings of the tax court on this issue, and quote with approval its opinion dealing with it:

"ORS 722.150 requires the plaintiff as a savings and loan association to set aside ten percent of its income annually as an addition to a reserve for bad debts. The federal law and regulations (12 USC 1726, and regulations 563.11 to 563.14 of Title 12, Code of Federal Regulations) also require insured associations to set aside similar reserves.

"ORS 317.280 allows as a deduction from net in-

come a reasonable addition to a reserve for bad debts. The defendant's Reg 317.280(1)-(E) states that a reasonable addition to a reserve for bad debts depends upon the facts of each case. Consideration must also be given to the loss record, the total amount of the existing reserves and the fact that the reserve is not a reserve for contingent losses. Baker Prod. Cr. Assoc. v. Commission, 2 OTR 191 (aff'd 245 Or 352, 421 P2d 984 (1966)).

"The plaintiff argues that when the legislature established a mandatory contingent fund by ORS 722.150 it foreclosed the question of whether additions to the reserve are deductible under ORS 317.280 or as ordinary and necessary expense under ORS 317.255. The plaintiff offered no evidence to establish any loss record nor indicated the size of its contingent fund.

"In Bellefontaine Fed. Savings & Loan Ass'n v. Commissioner, 33 TC 808 (1960), the taxpayer sought to sustain as a deduction an addition to a federal insurance reserve account on the grounds that the addition to the reserve was mandatory under the regulations of the Federal Home Loan Bank Board. The additions to the reserve were not allowed by the Internal Revenue Code. The Tax Court summarily dismissed the taxpayer's contention that the conflict between the Internal Revenue Code and the regulations regarding the mandatory reserve additions should be resolved by allowing the deduction. The court said:

" '* * * This contention is without merit, since it has been consistently held that the accounting requirements of regulatory agencies are not controlling in the application of the revenue laws, which establish their own standards. Old Colony R. Co. v. Commissioner, 284 U.S. 552, 562, Kansas City Southern Ry. Co. v. Commissioner, 52 F. 2d 372, 378, (C.A. 8); Toledo Terminal Railroad Co., 13 T.C. 64, 75; Gulf Power Co., 10 T.C. 852, 858, National Airlines, Inc., 9 T.C. 149, 161.' 33 TC at 811.

"See also Newport Federal Savgs. & Loan Ass'n v. U. S., 259 F Supp 82 (DC Ark 1960) 18 AFTR2d 5950.

"In South Side Bldg. & Loan Assn. v. Hooks, 188 F Supp 652 (DC Ohio 1960), 6 AFTR2d 5610, and Central Savings Assn. v. Hooks, 188 F Supp 654 (DC Ohio 1960), 6 AFTR2d 5611, the taxpayers contended that they should be allowed to deduct mandatory additions to a reserve account required by regulations of the Federal Deposit Insurance Corporation and the state laws of Ohio when the additions were in excess of those allowed by section 593 (adding to reserve for bad debts) of the Internal Revenue Code. There was no evidence of losses warranting the claimed deductions. The plaintiffs contended, as the plaintiff does in this case, that the federal regulation and the laws of Ohio constituted special legislation which controlled the Internal Revenue Code and justified the deduction. The court, on the basis of the *Bellefontaine* case, and the cases cited therein, found that the revenue statutes controlled the taxpayer's eligibility for the deduction and denied plaintiffs' claims.

"There is nothing in the Oregon tax statutes or the defendant's regulations which allows additions to bad debt reserves to be deducted merely because such reserves are required by other statutes or regulations without a showing of reasonableness and a loss experience warranting the deductions. Plaintiff is not entitled to the deduction as an addition to its reserve for bad debts.

"Neither is plaintiff entitled to the deduction as an expense under ORS 317.255 which allows the taxpayer to deduct all ordinary and necessary expenses paid during a taxable year in carrying on a business.

"In Wayne Title & Trust Co. v. Commissioner of Internal Rev., 195 F2d 401, (3rd Cir 1952), 41 AFTR 401, the taxpayer, who sold title insurance, was required by Pennsylvania law to maintain a prescribed percentage of title insurance premiums

in a re-insurance reserve. The taxpayer contended that the addition to the required reserve was an ordinary and necessary business expense. The court found that the reserve was one to cover contingent losses as compared to fixed losses and although it was mandatory it was not deductible as an expense. The same result was reached in Spring Canyon Coal Co. v. Commissioner of Int. Rev., 43 F2d 78, (10th Cir 1930), 9 AFTR 78, where the court found that reserves required under the workmen's compensation act were not deductible as expenses. The deductions were also disallowed as expenses in Philadelphia Title Insurance Co. v. Commissioner, 17 TC 1068 (1951) and in American Title Co. v. Commissioner, 29 BTA 479 (1933), where the court held that a reserve set up to meet future liabilities under title insurance policies is not deductible from gross income." 3 OTR Adv Sh at 16-18.

The decree of the tax court is affirmed.