OPINION
 I. INTRODUCTION
This matter comes before the court on remand from the Oregon Supreme Court, U.S. Bancorp v. Dept. of Rev., 337 Or 625, 103 P3d 85 (2004) (Bancorp III), cert. denied, 126 S Ct 48, 163 L Ed 2d 48 (2005).
In Bancorp III, the Supreme Court affirmed this court's decision after trial in U.S. Bancorp v. Dept. of Rev., 17 OTR 232 (Bancorp II),adh'd to as modified on recons, 17 OTR 273 (2003), which upheld the validity of an agreement between the parties to extend the limitations period during which Defendant (the department) could issue a notice of deficiency to Plaintiff (taxpayer). 337 Or at 643. The Supreme Court reversed, however, this court's decision in U.S. Bancorp v. Dept. ofRev., 15 OTR 375 (2001) (Bancorp I). In Bancorp I, in granting the taxpayer's motion for partial summary judgment, this court held that OAR150-314.280-(M) (1995) (Revised M) was not intended to be applied retroactively to the tax years in question and could not enter into the analysis of taxpayer's liability. *Page 2 15 OTR at 380. In Bancorp III, the Supreme Court reversed that decision and held that Revised M was intended to apply retroactively to the tax years in question, and that such retroactivity did not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. 337 Or at 636-40. The Supreme Court remanded the case to this court "for further proceedings." Id. at 644. Those proceedings, addressing claims by taxpayer and the counterclaim by the department, have included a full trial as well as extensive briefing and argument on all disputed issues.
 II. FACTS
As the Supreme Court noted in Bancorp III, "[t]he parties have engaged in extensive litigation relating to taxpayer's Oregon corporate excise tax liability for the tax years 1984 through 1992." 337 Or at 627 n 1. At this point, only tax years 1988 through 1992 remain in dispute.See id. (so noting); Bancorp II, 17 OTR at 233-34 (summarizing the litigation involving tax years 1984 through 1987). The statutory and regulatory framework applicable to tax years 1988 through 1992, as well as the basic facts of this case, were well summarized by the Supreme Court in Bancorp III:
 "To provide context for the facts and the parties' arguments respecting the department's authority to require taxpayer to utilize an alternative apportionment formula, we first provide background as to the statutory and regulatory framework that underlies this dispute. Taxpayer is a unitary financial organization that does business both in Oregon and in other states. See ORS 314.610(4) (defining `financial organization' for purposes of ORS 314.605 to 314.675). As a financial organization, it is excluded from the coverage of the Uniform Division of Income for Tax Purposes Act (UDITPA), and, instead, its net income for purposes of the Oregon corporate excise tax is determined under ORS 314.280. See ORS 314.615 (excluding financial organizations with taxable income from both within and outside Oregon from UDITPA). During 1988 through 1992, the tax years at issue in this dispute, ORS 314.280 provided, in part:
 `(1) If a taxpayer has income from business activity as a financial organization * * * which is taxable both within and without this state * * * the determination of net income shall be based upon the business activity within the state, and the department shall have power to permit or require either the segregated method of reporting or the apportionment method of reporting, under rules and regulations adopted by the department, so as fairly and accurately to reflect the net income of the business done within the state. *Page 3 
 `(2) The provisions of subsection (1) of this section dealing with the apportionment of income earned from sources both within and without the State of Oregon are designed to allocate to the State of Oregon on a fair and equitable basis a proportion of such income earned from sources both within and without the state. Any taxpayer may submit an alternative basis of apportionment with respect to the income of the taxpayer and explain that basis in full in the return of the taxpayer. If approved by the department that method will be accepted as the basis of allocation.'
 "Pursuant to the authority that ORS 314.280
confers upon it, the department has adopted administrative rules governing methods of income reporting for taxpayers governed under that statute. For the tax years at issue, as is also true now, many of the department's rules promulgated under ORS 314.280 incorporated provisions of UDITPA or rules that the department had adopted to implement UDITPA. As pertinent here, OAR 150-314.280-(C) adopts by reference the UDITPA requirement that a taxpayer utilize the apportionment method of income allocation when the taxpayer's business activities in Oregon are part of a unitary business that is carried on both within and outside the state. OAR 150-314.280-(C) (incorporating OAR 150-314.615-(D)); OAR 150-314.615-(D) (requiring apportionment method in such circumstances). During the relevant tax years, the department also required financial organizations to apply a modified version of the UDITPA three-factor apportionment formula. See generally Twentieth Century-Fox v. Dept. of Rev., 299 Or 220, 224, 700 P2d 1035 (1985) (describing operation of UDITPA three-factor apportionment formula). OAR 150-314.280-(E) (1987) provided, in part:
 `After deducting the nonapportionable income, the remainder shall ordinarily be apportioned to this state by giving equal weight to three factors.
 ``For a financial organization, the three factors shall be payroll, property and gross revenue.
 `"Property" means real and tangible personal property used in the business. *Page 4 
 `"(Emphasis added.) See also OAR 150-314.280-(F)
(1987) (incorporating UDITPA methodology for determining `property factor' set out in ORS 314.655 and its related rules).
 "In addition to those provisions, during the relevant tax years, the department also imported restrictions from UDITPA that narrowly limited the department's authority to permit or require a taxpayer to deviate from standard methods of income reporting that the department had prescribed by rule under ORS 314.280. Under the rule adopting those limits, the department possessed authority to permit or require a taxpayer to utilize an alternative income reporting method only if the applicable standard method did not represent fairly the taxpayer's `business activity' in Oregon and resulted in a violation of the taxpayer's state or federal constitutional rights. Specifically, OAR 150-314.280-(M) (1987) provided, in part:
 `If the allocation and apportionment provisions of OAR 150-314.280-(A) to 150-314.280-(L) do not fairly represent the extent of the taxpayer's business activity in this state and result in the violation of the taxpayer's rights under the Constitution of this state or of the United States, the taxpayer may petition for and the department may permit, or the department may require, in respect to all or any part of the taxpayer's business activity:
 `(1) Separate accounting;
 `(2) The exclusion of any one or more of the factors;
 `(3) The inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this state; or
 `(4) The employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income.'
 "(Emphasis added.) See also ORS 314.670 (1987) (similarly restricting variation from standard apportionment provisions of UDITPA).
 "In 1995, this court issued its decision in Fisher Broadcasting, Inc. v. Dept. of Rev., 321 Or 341, 898 P2d 1333 (1995). In that case, the taxpayer had challenged the validity of OAR 150-314.280-(I) (1983) — the predecessor rule to OAR 150-314.280-(M) (1987) — which similarly incorporated restrictions from UDITPA limiting the department's authority to permit or require deviation from the department's rules prescribing standard methods of income reporting under ORS 314.280. After reviewing the text and context of ORS 314.280, this court agreed with the taxpayer that the restriction against alternative reporting methods set out in OAR 150-314.280-(I)
(1983) was beyond the scope of the department's rulemaking authority under ORS 314.280. In reaching that conclusion, the court first observed that the legislature expressly had excluded certain taxpayers from the coverage of UDITPA and, in doing so, had demonstrated an intent to preserve for those taxpayers `the advantages of individual judgment and flexibility' that had existed under ORS 314.280. Id. at 353-55. Because the department lacked authority to override that legislative choice, the court concluded that the department was not authorized to subject taxpayers covered under ORS 314.280 to the same restrictions against utilizing alternative methods of income reporting that existed for taxpayers governed by UDITPA. Id. at 355. *Page 5 
 "The court went on to observe that, even if the department had been authorized to limit its power in such a way, the UDITPA standard incorporated under OAR 150-314.280-(I) (1983) was incompatible with the text of ORS 314.280. Specifically, the court pointed out that, although ORS 314.280
directs the department to adopt reporting methods that `"fairly and accurately reflect the net income of the [taxpayer's] business done within the state[,]'" the UDITPA standard incorporated under OAR 150-314.280-(I) (1983) authorized the department to permit or require alternative reporting methods only when the standard method did not `"fairly represent the extent of the taxpayer's business activity in this state.'" Id. at 355 (quoting ORS 314.280 and OAR 150-314.670 (1987)) (emphasis in Fisher Broadcasting). Thus, the court determined that OAR 150-314.280-(I) (1983) also was invalid because, contrary to the legislative mandate of ORS 314.280, that rule did not allow a taxpayer to challenge the application of a standard income reporting method upon the ground that it did not result in an accurate reflection of the taxpayer's net income from business done within the state. Id. at 359.
 "In 1995, in response to this court's decision in Fisher Broadcasting, the department amended the rule governing its authority to permit or require deviation from the department's rules prescribing methods of income reporting under ORS 314.280. The department's new rule provided that the department had authority to permit or require an alternative reporting method — including the use of an additional factor in an apportionment formula — whenever a standard method did not `fairly and accurately' reflect the taxpayer's net income from business done within Oregon. OAR 150-314.280-(M) (1995) provided, in part:
 `(1) For taxpayers that are taxable both within and without Oregon, the provisions of ORS 314.280 will ordinarily require apportionment to arrive at a fair and accurate measure of net income from business activity in Oregon. If the taxpayer can show that no unitary relationship exists between its business activities within Oregon and those activities outside Oregon, then taxpayer may use separate accounting. *Page 6 
 `(2) If the allocation and apportionment provisions of OAR 150-314.280-(A) to 150-314.280-(N) do not fairly and accurately reflect the net income of the business done within Oregon, based on the taxpayer's business activity within Oregon, the department may require or the taxpayer may request an alternative method of apportionment and the department may approve that method of apportioning all or any part of the net income from the taxpayer's business activity within Oregon:
 `* * * * * `(4) Examples of alternative methods of apportionment include:
 `(a) The exclusion of any one or more of the factors;
 `(b) The inclusion of one or more additional factors which will fairly and accurately reflect the taxpayer's net income from business activity in Oregon; or
 `(c) The employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income.'
 "(Emphasis added.)
 "With that background in mind, we turn to the facts of this case. Taxpayer filed its Oregon corporate excise tax returns for the years 1988 through 1992 by applying the standard three-factor apportionment formula that the department had prescribed for financial organizations at that time. See 337 Or at 630-31
(setting out OAR 150-314.280-(E) (1987)). Consistently with the definition of the `property' factor of that formula, taxpayer did not include intangible personal property in its apportionment computations. See OAR 150-314.280-(E) (1987) (defining `property' factor as `real and tangible personal property used in the business').
 "In 1998, the department audited taxpayer's tax returns for the years at issue and determined that inclusion of taxpayer's intangible personal property in the apportionment formula resulted in a more accurate allocation of taxpayer's net income to Oregon. Applying the 1995 version of OAR 150-314.280-(M), set out above, the department included taxpayer's intangible personal property in the apportionment calculation, and, based upon that inclusion, it issued notices of deficiency against taxpayer for the five years at issue." *Page 7 
337 Or at 629-35 (footnotes omitted).[1]
As noted above, this litigation ensued. Taxpayer's Fourth Amended Complaint, the one before the Supreme Court in Bancorp III, contained two claims: first, that the department did not identify the source of its authority to adjust taxpayer's returns and that no such authority existed; and second, that the Notices of Deficiency (NODs) issued in this case were time-barred. (Resp't's Br to Supreme Court at 4, 20.) The Supreme Court upheld this court's decision in favor of the department on taxpayer's second claim. Bancorp III, 337 Or at 643. It reversed this court's grant of partial summary judgment to taxpayer on taxpayer's first claim. Id. at 640. That had the effect of a denial of taxpayer's motion for partial summary judgment. Importantly, the department had not filed a cross motion for summary judgment at that stage of the case and neither this court nor the Supreme Court addressed any affirmative claim for relief by the department. *Page 8 
Following the Supreme Court's remand, taxpayer filed, with this court's leave, a Fifth Amended Complaint. That complaint clarified the specifics of taxpayer's remaining claim. In short, taxpayer attacks the department's adjustment of its returns on four grounds. First, taxpayer argues that Revised M was not intended to apply retroactively, and that retroactive application of that rule is unconstitutional. Second, taxpayer argues that Revised M is invalid because it is inconsistent with ORS 314.280.[2] Third, taxpayer argues that the department improperly applied Revised M to taxpayer, if it applied that rule at all. Fourth, taxpayer argues that application of Revised M to it is unconstitutional on the grounds of arbitrariness and unequal treatment. The court takes each argument in turn and concludes by analyzing the department's counterclaim, which was the subject of the proceedings inBancorp III.
 III. ISSUES
(A) What is the scope of the remand in this case?
(B) Is Revised M inconsistent with ORS 314.280?
(C) Was Revised M, if consistent with ORS 314.280, properly applied to taxpayer?
(D) Did application of Revised M to taxpayer violate taxpayer's constitutional rights?
(E) Should the department prevail on its counterclaim?
 IV. ANALYSIS
A. The Scope of Remand
As an initial matter, the parties dispute the extent of the Supreme Court's holding in Bancorp III and, consequently, the scope of permissible proceedings on *Page 9 
remand to this court. The department asserts that litigation on remand of the first three of taxpayer's arguments was improper because those issues were either decided by the Supreme Court in Bancorp III or were waived by taxpayer. To support its assertion, the department relies on the following doctrines: law of the case, claim preclusion, issue preclusion, judicial admission, judicial estoppel, and waiver.
Under the "law of the case" doctrine, those portions of a prior appellate opinion that were necessary to the disposition of that appeal are binding and conclusive upon the inferior court in any further steps or proceedings in the same litigation; for the reason that parties should not revisit issues that have already been fully considered and decided in the same proceeding. Hayes Oyster Co. v. Dulcich,199 Or App 43, 53, 110 P3d 615, rev den, 339 Or 544, 125 P3d 750 (2005). Analyzing the department's "law of the case" argument, then, requires this court to determine which portions of Bancorp III were necessary to the disposition of, and decided in, that appeal.
As the Supreme Court stated in Bancorp III: "Both parties agree that, if Revised M governs this dispute, then the department had authority under that rule to include taxpayer's intangible personal property in the apportionment calculation." 337 Or at 636. The court also noted that "[f]or purposes of its summary judgment motion, taxpayer does not dispute the department's averment that inclusion of taxpayer's intangible personal property results in a more accurate apportionment of its net income to Oregon." Id. at 636 n 6. Instead, the court described taxpayer's argument as focusing on whether Revised M was intended to apply retroactively, and, if so, whether such retroactivity was constitutional. Id. at 636. The court then devoted its *Page 10 
analysis to answering those questions, both times in the affirmative.See id. at 636-40. Ultimately, the Supreme Court concluded that this court "erred by holding that the department lacked authority to include taxpayer's intangible personal property in the apportionment formula used to allocate taxpayer's income to Oregon under ORS 314.280 for tax years 1988 through 1992." Id. at 640. In a footnote, the Supreme Court declined to consider taxpayer's right-for-the-wrong-reason argument that "Revised M is invalid because it exceeds the department's rulemaking authority under ORS 314.280." Id. at 636 n 7. The Supreme Court did so, it said, because taxpayer had already emphasized to this court that "it did not question the department's authority to promulgate Revised M" under ORS 314.280. Id.
From those statements, the department contends that the Supreme Court decided the following issues adversely to taxpayer: that Revised M applies retroactively, that such retroactivity is constitutional, that Revised M comports with ORS 314.280, and that the department complied with the rule in this case. That view is only partially correct. It is eminently clear that Bancorp III was primarily about retroactivity. The court's holdings in that regard were the focus of the Supreme Court's analysis, and were necessary to the disposition of the appeal. They are the "law of the case" and are binding on this court on remand. Accordingly, taxpayer's retroactivity argument must be rejected.
That is, however, the only argument to which the "law of the case" doctrine applies here. As the Supreme Court noted, taxpayer agreed that inclusion of its intangible personal property results in a more accurate apportionment only for purposes of its summary judgment motion.Bancorp III, 337 Or at 636 n 6. In order to reach the question whether Revised M applies retroactively, which was the only question taxpayer wanted to present in its motion for partial *Page 11 
summary judgment, taxpayer chose to agree, for purposes of summary judgment, that the rule was validly applied in all other respects;[3]
otherwise, the existence of a genuine issue of material fact or a collateral legal question might have precluded resolution of the retroactivity issue. That agreement was not an admission of fact or law for any other purpose. Nor were the validity or proper application of Revised M issues analyzed and decided by this court in Bancorp I or the Supreme Court in Bancorp III. In fact the department not only admitted as much in its briefing to the Supreme Court in Bancorp III, it aggressively promoted just this point. The department admitted this in its briefs in Bancorp III: "The Tax Court never addressed the effect of that rule because it reasoned that rule was not expressly made retroactive and therefore will not be applied by the court in the years in question. 15 OTR at 380." (Appellant's Br in Bancorp III at 10.) In its Reply Brief in Bancorp III, the department stated the question of validity of Revised M had been raised by taxpayer for the first time on appeal. (Appellant's Reply Br in Bancorp III at 4.) Those statements are completely inconsistent with the arguments the department now makes to the effect that question of the validity of Revised M was decided inBancorp III.
The treatment the Supreme Court gave to the issue, taking into account especially its action on taxpayer's Petition for Reconsideration, demonstrates that the Supreme Court did not address the question of the validity of Revised M. Initially the Supreme Court stated in footnote:
 "Before this court, taxpayer also argues that OAR 150-314.280-(M) (1995) is invalid because it exceeds the department's rulemaking authority under ORS 314.280. Before the Tax Court, however, taxpayer emphasized that it did not question the department's authority to promulgate OAR 150-314.280-(M) (1995), specifically asserting that `ORS 314.280(1) clearly gives the Department the authority to promulgate such a rule.' As a result of that position in the Tax Court, we conclude that taxpayer did not preserve its challenge to the department's authority to promulgate OAR 150-314.280-(M) (1995) for this court's review. See State v. Wyatt, 331 Or 335, 341-43, 15 P3d 22 (2000) (discussing requirements for preservation of error); see also Western Generation Agency v. Dept. of Rev., 327 Or 327, 331-32 n 4, 959 P2d 80 (1998) (discussing same)." *Page 12 
Pet for Recon Exh 1 at 14 n 7.
In its Petition for Reconsideration taxpayer pointed out that it had not conceded the validity argument and that the court should consider it under the "right for the wrong reason" doctrine. The Supreme Court, on reconsideration, revised footnote 7 to read:
 "Before this court, taxpayer also argues that OAR 150-314.280-(M) (1995) is invalid because it exceeds the department's rulemaking authority under ORS 314.280. Before the Tax Court, however, taxpayer emphasized that it did not question the department's authority to promulgate OAR 150-314.280-(M) (1995), specifically asserting that `ORS 314.280(1) clearly gives the Department the authority to promulgate such a rule.' As a result of that position in the Tax Court, we decline to exercise our discretion to address taxpayer's challenge to the department's authority to promulgate OAR 150.314.280-(M) (1995). See Outdoor Media Dimensions Inc. v. State of Oregon, 331 Or 634, 658-60, 20 P3d 180
(2001) (discussing `right for the wrong reason' doctrine).
Bancorp III at 636 n 7.
Given this series of events, it is impossible to conclude that the Supreme Court even addressed, much less decided, the questions of validity or proper application of Revised M. The court exercised its discretion, in the context of a remand, to not address the validity argument. Although it may not have addressed the issue as decided "right for the wrong reason," it does not follow that the court somehow applied a doctrine of "wrong and precluded without reason."
Taxpayer's second and third arguments against application of Revised M are not precluded by the "law of the case" doctrine. Nor are they precluded by the doctrine of claim *Page 13 
preclusion, in either its common law or statutory form, ORS 43.130.[4]
Common law claim preclusion applies only to those claims that were determined in a "final judgment" and that are sought to be "prosecut[ed] in another action." Van De Hey v. U.S. National Bank, 313 Or 86, 91,829 P2d 695 (1992) (quoting Drews v. EBI Companies, 310 Or 134, 140,795 P2d 531 (1990)). There is no second action present here, only the same action that was before the Supreme Court. Similarly, ORS 43.130 states that it applies only to actions "subsequent" to an original action.[5]
The same is true for both the common law and statutory forms of issue preclusion, ORS 43.160.[6] See Hayes Oyster, 199 Or App at 50
("[I]ssue preclusion does not apply to claims within the same case.").
Judicial admission also is inapposite. A judicial admission is a statement "made by a party * * * for the purpose of dispensing with proof of a fact in issue," and not "merely a statement or assertion or concession, made for some independent purpose." State v. Harris,339 Or 157, 172-73, 118 P3d 236 (2005) (citations omitted). As stated above, taxpayer's concessions regarding the validity and application of Revised M were made for only one *Page 14 
purpose: to frame and isolate for decision the issue of that rule's retroactivity in the context of a motion for partial summary judgment.See Bancorp I, 15 OTR at 380 (discussing only retroactive application as to Revised M); Bancorp III, 337 Or at 636 n 6 (noting that taxpayer's concession of the proper application of Revised M was only "[f]or purposes of its summary judgment motion"). Taxpayer did not concede any facts for the purpose of dispensing with proof requirements.
For the same reason, judicial estoppel does not apply here either. Judicial estoppel applies "under certain circumstances to preclude a party from assuming a position in a judicial proceeding that is inconsistent with the position that the same party has successfully asserted in a different judicial proceeding." Day v. Advanced MD Sales,Inc., 336 Or 511, 524, 86 P3d 678 (2004) (quoting Hampton Tree Farms,Inc. v. Jewett, 320 Or 599, 609, 892 P2d 683 (1995)) (internal quotation marks omitted). Taxpayer has not taken an inconsistent position. Rather, taxpayer has maintained throughout these proceedings that, for purposes of its summary judgment motion on retroactivity only, it would concede the validity and otherwise proper application of Revised M. Given the result in Bancorp III, effectively denying taxpayer's motion for partial summary judgment on retroactivity, taxpayer remains free to advance other arguments against application of Revised M, including those arguments it conceded for purposes of its summary judgment motion.
The department appears to misunderstand, at a fundamental level, the purpose and effect of summary judgment motions. Taxpayer did not need to lump every argument it might have into one omnibus summary judgment motion. Instead, it had the right to spread its various *Page 15 
arguments against application of Revised M over several different motions, or save some for trial. Taxpayer chose to hold off several of its arguments in favor of pressing one that it felt would end the litigation most expeditiously. The ultimate failure of that tactic on the retroactivity argument, although initially successful, does not deprive taxpayer of its right to press its other arguments. SeeSilbernagel v. Goin, 41 Or App 269, 272-73, 597 P2d 1287 (1979) (so stating). It is wrong to argue that taxpayer waived those other arguments when it is clear that taxpayer had reserved them in case its main argument failed. See Waterway Terminals v. P.S. Lord, 242 Or 1, 26,406 P2d 556 (1965) (holding that waiver "is the intentional relinquishment of a known right" that "must be manifested in some unequivocal manner"). The department's argument seems to boil down to the proposition that, because taxpayer ultimately lost on its motion for partial summary judgment, it must have lost the case entirely. That view is patently incorrect. See Silbernagel, 41 Or App at 272-73 (so indicating). Also, it is fundamentally flawed in this case because the department never requested, by cross motion, a judgment in its favor. Accordingly, the court will address in turn each of taxpayer's three remaining claims against application of Revised M.
B. Is Revised M Consistent with ORS 314.280?
1. History and Development of ORS 314.280; Requirement ofRulemaking
From the beginnings of income taxation of business enterprises in Oregon until 1965, ORS 314.280 was the statute under which all enterprises were taxed. It was, and is, characterized by a general statement of legislative guidance (the determination of net income shall be based on business activity in the state) and a broad grant of agency authority and responsibility to permit or require methods (segregated or apportionment) and bases (for *Page 16 
apportionment) "so as fairly and accurately to reflect the net income of the business done within the state." ORS 314.280(1).
An initial question of importance is whether, in applying ORS 314.280, the department must promulgate rules in advance of adjudication or application of the statutory guidelines. On this question, Trebesch v.Employment Division, 300 Or 264, 710 P2d 136 (1985), controls the analysis. Trebesch set out the elements of the problem, concluding first that the answer is a matter of statutory or legislative intent and is not found in the constitution, judge-made law of administrative agencies, or the Administrative Procedures Act (APA). Id. at 267. It is quite relevant, however, in the context of this case, to pause briefly to consider the extent to which constitutional concerns, even if not determinative, inform the analysis. Trebesch cited Anderson v.Peden, 284 Or 313, 587 P2d 59 (1978), and a series of other cases that recognized that rulemaking and, implicitly, agency action in accordance with rules, protects against a claim of ad hoc decision-making in violation of Article I section 20 of the Oregon Constitution.[7]Id. Those cases point out that ad hoc action by an agency or its employees is a major source of concern as to claims regarding equal treatment of the very type that have been made in this case by the taxpayer.
As Trebesch concluded, however, rulemaking requirements cannot be deduced directly from constitutional provisions. Id. Rather the duty to make rules, if it exists, is a result of statutory direction found through interpretation of the statutes regulating the agency in question, here the department. Id. The first inquiry, of course, is whether the statutes require prior *Page 17 
rulemaking for enforcement of ORS 314.280. When such a requirement exists, rules must be made prior to adjudication or application of the law. Marbet v. Portland Gen. Elect., 277 Or 447, 460-62, 561 P2d 154
(1977).
Dinkins v. Board of Accountancy, 118 Or App 220, 846 P2d 1186 (1993), provides guidance about when statutory language requires pre-adjudication rulemaking. In Dinkins, the statute required that applicants "[h]ave had two years' public accounting experience or the equivalent thereof satisfactory to the board under its rules * **." Id. at 222 (emphasis in orginal) (citation and quotation marks omitted). The Court of Appeals concluded that this language required rulemaking to specify what accounting experience could be equivalent to public accounting experience. ORS 314.280(1) clearly states that department action is to be "under rules and regulations adopted by the department." It is clear from the statute and foregoing case law that the provisions of ORS 314.280 contain a legislative scheme in which the agency must develop a very general legislative purpose through rulemaking. The Oregon Supreme Court has so concluded:
 "The controlling factors are that the legislature since 1929 has directed that unitary income of a corporation be apportioned between the states in which it is earned, and has directed the commission to adopt rules and regulations to fairly and equitably accomplish that apportionment."
Equitable Savings Loan v. Tax Com., 251 Or 70, 77, 44 P2d 916 (1968) (Equitable).
That construction of the statute is conclusive.[8] However, a review of the factors that *Page 18 
have guided the courts in less well defined cases is helpful. It will disclose the underlying reasons for the rulemaking requirement that can be considered in connection with the parties' arguments in this case.
Trebesch directed analysis of the following matters when analyzing rulemaking requirements:
 (1) the character of the statutory terms;
 (2) the division of authority in the administration of the statues; and
 (3) the agency structure, in determining when pre-adjudication rulemaking is required.
Trebesch, 330 Or at 270.
Statutory terms delegating policymaking discretion "are those which empower the agency to develop and expound its own vision of how a law or a scheme of regulation should be applied." Trebesch at 271. Such terms imply a legislative rulemaking requirement. The parties agree that and prior case law recognizes that ORS 314.280 confers legislative rulemaking authority with respect to the terms so as "fairly and accurately to reflect the net income of the business done within this state," and "on a fair and equitable basis a proportion of such income from sources both within and without the state." Accordingly, as discussed above, the character of the terms confirm a requirement of rulemaking to implement ORS 314.280. *Page 19 
In Trebesch, the organization of the agency included an executive function charged with interpreting and developing the statutes that the agency administered. 300 Or at 266. That executive, an assistant director, was authorized to "determine all questions of general policy and promulgate rules and regulations and be responsible for administration of" the relevant statutes. Id. at 270 (citation and quotation marks omitted). In those matters, the statutory structure is the same for the department, with the exception that the director of the department is the chief executive. Cf. ORS 305.015, 305.035, 305.045,305.100. Of most importance, the Employment Division operated, and the department regularly operates, through numerous subordinate employees located throughout the state.
The court in Trebesch concluded there was no doubt that the legislature intended the terms in question in the statute in that case to be applied uniformly throughout the state. Id. at 273. Notwithstanding certain arguments made by the department in this case and discussed below, the court finds that the same is true about the terms of ORS 314.28 — they are to be applied uniformly throughout the state.[9] The agency in Trebesch, like the department, is decentralized in actual decision-making done by auditors. Id. Therefore, as in Trebesch, "the uniform application of the law can only be met when employees at all levels operate with the same understanding of the terms. This assumes the director will communicate in some way with the initial decision-makers * * * in order to ensure uniform application of the law." Id.
The Oregon Supreme Court has recognized that such agency communication, which needs to be to internal and external audiences, can occur through reasoned opinions in *Page 20 
adjudicated cases. See Ross v. Springfield School District No. 19,300 Or 507, 517, 716 P2d 724 (1986). But when that is done, the agency "needs to find a way to assure that different [decision-makers] follow the criteria so developed or give adequate reasons for departing from an earlier interpretation." Id. at 519.
The question becomes how an agency must communicate its policy and interpretive positions, and, as in Trebesch, a review of agency structure and the context in which the agency operates can help supply an answer. In Trebesch, the court looked to the nature and scope of this adjudicatory function of the agency official charged with insuring proper application of the law. Trebesch, 300 Or at 274-76. The court was unsure of the scope of adjudicatory authority, concluding, however, that in order to avoid a conclusion that rulemaking was necessary, the agency official would need to have the ability to review for errors of law and the ability to "elaborate the statutory term at issue in this case and similar terms and address characteristic problems in the application of those terms, by a series of well articulated opinions not limited to the narrow facts of a case, which are designed to give guidance to agency decision-makers." Id. at 276.
In the case of the department, a structural change in its functions occurred such that both at the time it promulgated Revised M and, more importantly, at the time taxpayer's returns were audited, the director had lost her adjudication function. In Oregon Laws 1995, chapter 650, the legislature removed initial adjudication of cases from the functions of the department, transferring that function to the newly created Magistrate Division of this court. Revised M was promulgated December 31, 1995, by which time the decision to shift initial adjudicatory function had been made. That decision was fully implemented on September 1, 1997, long before the *Page 21 
audit of the returns in question occurred. This prong of theTrebesch analysis points clearly to a requirement of rulemaking designed to educate and regulate agency staff and the public.
Faced with the statutory direction to make rules and the considerations discussed above, the director of the department had the obligation to proceed by rulemaking in order "to provide for consistent interpretation and application of the broad terms of the statute."Trebesch at 27-77. To paraphrase Trebesch:
 "Some notice of [the meaning of the terms] both to those who apply the term and those like [taxpayer] to whom it is applied, is required when a large volume of frequently recurring decisions is made by * * * employees throughout the state. In the absence of rules * * * the first level decision-makers must embark upon local, autonomous definitions of the statute in place of a uniform statewide interpretation articulated by the responsible [department] official. The statutes contemplate that those applying the term will have notice of a uniform standard * * * and that those standards will be set by the [director] not [auditors] * * * ."
Id. at 277.
Resisting a conclusion of the requirement of rulemaking, the department cites Swenson v. Dept. of Rev., 6 OTR 234, 238-39 (1975),aff'd 276 Or 1, 553 P2d 351 (1976), for the proposition that an administrative rule is not required for application of valuation methods under ORS 308.205. In fact, Swenson was not decided under the general property value statute, ORS 308.205, but rather under ORS 321.310(2), a statute specifically dealing with valuation of timber.[10]Id. Secondly, the statutory provisions of ORS 321.310(2) contained detailed *Page 22 
statements of factors to be considered. The statute was the type of complete statement of legislative policy that, under Trebesch, permits agency action without prior rulemaking. Trebesch at 271-72. Finally,Swenson was decided well before the comprehensive case law developments in this area reflected in Trebesch, Ross, and other cases.
 2. What Rules Did the Department Make? *Page 23 
The department promulgated three rules relevant to this case: OAR150-314.280-(E) (1987) (the E Reg); Revised M, as mentioned above; and OAR 150-314.280-(N) (1995) (the N Reg). The E Reg, a set of apportionment rules for financial institutions, was in force from before the time the returns in question were filed and continued in force until January 1, 1993, throughout all the years at issue. The E Reg required that the property factor of the apportionment formula include only real and tangible personal property. As of January 1, 1993, the N Reg became effective. As compared with the E Reg, it was an even more comprehensive set of rules for apportionment of financial institution income and provided inclusion of intangible property in the property factor and special treatment of income from intangibles in the sales or revenue factor.[11] No other regulation or rule spoke directly to the composition of the property factor in the apportionment formula. The taxpayer filed its returns in conformity with the E Reg, the rule in effect at the time the returns were filed. The department, however, did promulgate Revised M in 1995, and the Supreme Court has reversed this court's decision that Revised M was not intended to apply retroactively to the years 1988 through 1992. Bancorp III. It is now appropriate to determine what, if any, force Revised M has and whether it could be, and was, a source of authority for the actions taken by the department and its employees in this *Page 24 
case.
Revised M does not address the property factor or the question of inclusion of intangible property in that factor. Instead, Revised M states:
 "(1) For taxpayers that are taxable both within and without Oregon, the provisions of ORS 314.280
will ordinarily require apportionment to arrive at a fair and accurate measure of net income from business activity in Oregon. If the taxpayer can show that no unitary relationship exists between its business activities within Oregon and those activities outside Oregon, then the taxpayer may use separate accounting.
 "(2) If the allocation and apportionment provisions of OAR 150-314.280-(A) to 150-314.280-(N) do not fairly and accurately reflect the net income of the business done within Oregon, based on the taxpayer's business activity within Oregon, the department may require or the taxpayer may request an alternative method of apportionment and the department may approve that method of apportioning all or any part of the net income from the taxpayer's business activity within Oregon:
 "(3) The request to use an alternative method of apportionment shall be filed in writing with the department. The request must be signed by the taxpayer or the taxpayer's authorized representative and shall be filed separately from the taxpayer's return. The request shall include a complete explanation of the alternative method as well as an explanation why the apportionment factors in OAR 150-314.280-(A) through OAR 150-314.280-(N) should not be used. Upon receipt of the request, the department will review it and issue a letter either authorizing or denying the request. If denied, the taxpayer can appeal that action as provided in ORS 305.275. An alternative apportionment method may be used only after receiving written authorization from the department. The authorization may be revoked if, upon audit, it is determined that the alternative method does not arrive at a fair and accurate measure of net income from business activity in Oregon. Once an alternative method has been authorized, it shall be used until a request to change is made and approved by the department or until the authorization is revoked in an audit.
 "(4) Examples of alternative methods of apportionment include:
 "(a) The exclusion of any one or more of the factors;
 "(b) The inclusion of one or more additional factors which will fairly and accurately reflect the taxpayer's net income from business activity in Oregon; or *Page 25 
 "(c) The employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income."
3. Department Position
Faced with a position on treatment of intangibles directly at odds with that contained in the E Reg and with the N Reg rules on inclusion of intangibles not yet effective, the department has taken the position that under ORS 314.280 or Revised M, or both, an individual auditor may make a decision that fair and accurate apportionment requires inclusion of intangible property in the apportionment formula and that the E Reg be abandoned on that point.[12] The department defends an apportionment formula created by one auditor and combining inclusion of certain intangibles with a corresponding, but unique, treatment of revenue from those intangibles in the revenue factor. To reach that conclusion, the department relies on the language of Revised M authorizing the department to "require" alteration of the apportionment formulas. The department asserts this position even when, as here, the returns filed by the taxpayer are filed fully in compliance with the rules addressing the question, here the E Reg, and the taxpayer has made no request for an alternative apportionment basis or formula.[13] *Page 26 
4. Evaluation of Department Position and Arguments
The position of the department is fundamentally at odds with the statute in question and every consideration of law discussed above regarding the rules for limits on agency promulgation and application of policy. *Page 27 
At the outset, the department position is inconsistent with the provisions of ORS 314.280, which sets forth the chronological order in which department and taxpayer action is to occur. As discussed above, ORS 314.280 is properly read to require the department to promulgate rules to express its policy decisions and interpretations of the broad statutory terms. That first action not only gives guidance to department personnel for the preparation of return forms and instructions, but also provides a set of rules for taxpayers to follow in the returns required of them under the self-reporting tax system which exists. See, e.g. ORS317.710 (stating requirement for corporations to file tax return) and ORS 305.265 (providing for audit after return filed). The chronology of rules first and returns second is not only explicit in the statutes, it is, in fact, how the department has proceeded. It has, at all times, had specific rules in place to guide the preparation of returns. Seegenerally OAR 151-314.280 and its subsections. ORS 314.280 further contemplates that variations from promulgated rules may be made, but the statute contemplates only changes proposed by the taxpayer and submitted in writing at the time the return is filed. Thus, any proposed change is to come after general rule promulgation but before any auditor becomes, or could become, involved.[14] The statute then recognizes that if, but only if, such an alternative is proposed by the taxpayer, the department may, but need not, accept or permit the alternative.
The department argues, however, that individual auditors may initiate the alternative discussion or requirement, pointing to the language in ORS 314.280(1) to the effect that the department may "permit or require" methods of reporting. The power of the department to *Page 28 
require certain matters is conceded by the court. This history of the rule on the property factor shows that the department can, by rule, move from one approach to another with respect to intangibles. However, that concession does not answer the questions of when and whether the power is, or has been, exercised. As to "how," the earlier analysis demonstrates that any requirements under ORS 314.280 must be set out by rules so as to give guidance to staff and taxpayers and minimize the risk of unconstitutional lack of uniform application. However, Revised M, although it sets out possible tools or alternatives to be used, does not say under what conditions they are to be used or considered, even in general terms or within specified ranges. The department argues that absolute discretion is lodged with the individual auditor as to whether to initiate a change and what change to initiate. That conclusion cannot be reconciled with statutory requirements of ORS 314.280 or the basic administrative law principles that ORS 314.280 imposes with respect to agency action by rulemaking.
As to "when" a power to require some method or basis may or must be exercised, the internal chronological logic of ORS 314.280, and the general provision of the tax statutes on the process of returns and audits, admit of only one logical answer. The power to require any particular method or formula must initially be exercised before the taxpayers subject to it file their returns. Only then can taxpayers react to department promulgated requirements by submitting alternatives "in the return of the taxpayer."[15] *Page 29 
In fact, the text of Revised M, in toto, is only consistent with a process by which a taxpayer proposes changes to pre-established methods of apportionment promulgated by the department. Subsection (3) of Revised M, quoted above, contemplates that a request for use of alternative methods is filed with, but separate from, the return — presumably because the return is to be prepared in accordance with the methods the department has promulgated by rule. That conclusion is consistent with a later provision of the rule that requires department approval before any alternative method is used. The taxpayer must completely explain the alternative and why the regular method is not appropriate. Under Revised M, a request, if granted, may be revokedon audit, if the goal of fair and accurate measurement of net income is not achieved. Thus, Revised M itself is logically inconsistent with the notion that an alternative method could be proposed, by anyone, during the audit.
It is noteworthy that, except for the self-serving statement in Revised M that the department can require alternative methods, nothing in the rule explains when or how this is to be done. The department's argument that its auditor may do this on audit by individual ad hoc action lacks any reflection in the rule, even though the rule addresses the audit stage in providing that prior approval of a taxpayer proposed alternative may be revoked at that stage.
Nor can it be said that Revised M as it is, and as it is interpreted by the department, is consistent with the fundamental requirement of ORS314.280 that the department act by rule. As the department sees things, Revised M is a rule that excuses any requirement to make rules and instead authorizes individual auditors to make and apply policy on a case by case basis. It cannot be true that legislative directions to make rules are fulfilled by making rules that purport to dispense with the rulemaking requirements. Statutory requirements of rulemaking do not *Page 30 
carry within themselves the seeds of their own destruction. Any such conclusion is inconsistent with all indicators of proper agency action.[16] It is inconsistent with the department's own actions, over decades, in providing detailed guidance to staff and taxpayers through rules. It is not supported by the actual provisions of Revised M. Finally, it is not supported by the authorities the department cites to defend its position, to which the court now turns.
Perhaps recognizing that it cannot bootstrap itself up on the question of ad hoc process with its own rules, the department seizes upon certain language in Fisher Broadcasting, Inc. v. Department of Revenue,321 Or 341 (1995), arguing that the language either creates or acknowledges some authority for case by case ad hoc decision-making. To understand this argument, a review of certain aspects of the FisherBroadcasting decision is needed.
Fisher Broadcasting involved a broadcasting company with relatively distinct markets and corporate operations, one in Seattle and one in Portland. Id. at 343. Pursuant to a 1974 agreement with the department, the taxpayer filed returns using the segregated method of accounting for many years. Id. at 344. These returns segregated Portland and Seattle operations and subjected only those in Portland to tax. Id. For tax years 1983 and 1984, the department audited the segregated method returns and proposed deficiencies based on the position that the apportionment method of accounting was required. Id. at 345. The deficiencies combined income from Seattle and Portland and apportioned that total between Washington and Oregon. Id. at 348. The department grounded its actions on a predecessor to Revised M, which stated no *Page 31 
rule itself, but rather incorporated by reference OAR 150-314.670, a rule on alternative apportionment methods adopted under UDITPA.Id. The UDITPA rule contained a presumption in favor of apportionment accounting that could be overcome only by a showing that the apportionment method, set out in detail in the statutes, did "notfairly represent the extent of the taxpayer's business activity in this state." Id. at 355 (emphasis in original) (citation and quotation marks omitted).
In rejecting the department's position, which had been upheld by this court, the Supreme Court took care to clarify that after 1965, Oregon had two statutory regimes for taxation of business income — the UDITPA regime and, separately, the regime of ORS 314.280 for utilities and financial institutions. Id. at 353-54. The court concluded that the technique of rule incorporation by reference, applied to incorporate presumptions and business activity standards, impermissibly incorporated UDITPA principles into the ORS 314.280 regime.[17] Id. at 355. The Supreme Court rejected that approach and remanded the case to the department for actions consistent with ORS 314.280. Id. at 359. Narrowly read, Fisher Broadcasting only addresses the determination of when the segregated method as contrasted with the apportionment of accounting may be permitted. However, the court's broader explanation of its conclusions is relevant to this case and its focus on apportionment methods.
The department asserts that Fisher Broadcasting stands for the proposition that the department not only can, but must exercise ad hoc, case-by-case review of the choice of *Page 32 
segregated or apportionment method and each element of any apportionment. Why? Because, the department observes, the court inFisher Broadcasting said the UDITPA regulation in question there, OAR 150-314.670:
 "specifically promotes the legislative goals of the UDITPA statutes, namely, uniformity, and 100 percent taxation among the states. Those goals are inconsistent with the goals of ORS 314.280. That statute seeks a fair and accurate method of reporting net income in Oregon. Uniformity is not part of the equation."
Fisher Broadcasting, 21 Or at 358 (emphasis in original).
The court had earlier stated:
 "The preservation of the earlier reporting regime for utilities and financial organizations, as found in ORS 314.280, is of great importance to taxpayer. Under the earlier regime, a utility had no initial burden to prove that a particular reporting method was "unfair" or "inaccurate." The statute simply allowed a taxpayer to utilize the most accurate method of reporting under rules delineated by the department. It was only after the department determined that a particular set of business circumstances required the use of one reporting method that a rebuttable presumption in favor of that method would arise.
 "Under the UDITPA statutes, by contrast, the department gains administrative ease and uniformity at the cost of flexibility and-possibly, in some cases-even accuracy. In that regime, a burden is placed on the taxpayer to show that the uniform method of reporting fails fairly to reflect business activity within the state. Then, as is discussed at greater length below, a taxpayer is required to show that the alternative to the uniform method is "reasonable" and will not create or promote a lack of "uniformity." It is clear, from the text and context of the statutes, that the legislature intended to leave in the advantages of individual judgment and flexibility with respect to utilities and financial institutions when it enacted UDITPA for other business taxpayers."
Id. at 354-55 (emphasis in orginal). From this language the department, in its writings and arguments, extracts the following propositions:
 (1) No department rule can state a general proposition because that would prevent the flexibility the court found to be a primary concern in ORS 314.280;
 (2) Flexibility and individual judgment are primary values of ORS 314.280, to the point that the department's auditors may, and indeed must, make case-by-case decisions on apportionment rules; and, *Page 33 
 (3) Concerns about equal treatment of taxpayers are trumped by the fact that, although uniformity is a value in UDITPA, it is, under ORS 314.280, in second place to flexibility and individual treatment.
Several observations about Fisher Broadcasting are important:
 (1) The Supreme Court, in Fisher Broadcasting, did not cite or discuss the well-established principles of Trebesch and other cases which survey the problem of consistent treatment under Article I, section 20, of the Oregon Constitution and the role of agency rulemaking in that analysis.
 (2) If there are Oregon Constitution, Article I, section 20, or federal equal protection issues or concerns in play, the legislature cannot obviate them.
 (3) The department can determine that a certain set of circumstances requires use of a particular method of apportionment; if it does so, a rebuttable presumption in favor of that method arises. Fisher Broadcasting, 321 Or at 354.
 (4) The agency — here the department (and not an individual auditor) is not "locked in" to any particular set of rules and regulations. The court specifically recognized the ability of the department to change its rules. Id. at 354 n 7.
 (5) Speaking of the limits on the ability of the department to make rules, the court observed: "We note only that, when the legislature demonstrates a clear intent to treat a small class of taxpayers differently and more individually than another class of taxpayers, the agency cannot undo that intent by rule." Id. at 354 n 7 (emphasis of class added).
From what the Supreme Court actually said in Fisher Broadcasting, it is clear that the department has seriously misread the Supreme Court's message. First, the Supreme Court recognized, as does this court, that the department has not only broad authority, but also an obligation, to act by rule under ORS 314.280. Id. at 355. Second, although the Supreme Court did use language such as "nonuniform" and "individual judgment,"id., in reference to the regime of ORS 314.280, a careful reading of all that was said by the court indicates that the "uniformity" to whichFisher Broadcasting referred was uniformity among the states.Id. at 358. *Page 34 
The court said so when it described the goals of UDITPA as being "uniformity, and 100 percent taxation among the states." Id. (emphasis added). The Supreme Court of Oregon clearly meant that the regime of ORS314.280 was not inspired by interstate uniformity. That cannot be read to mean that the court abandoned intrastate uniformity concerns expressed in the Oregon and federal constitutions.
The reference to "individual judgment" was one made to contrast the characteristics of ORS 314.280 to those of UDITPA. It, together with "flexibility," is set off against "administrative ease and uniformity."Id. at 354-55. That comparison is made at the same point that the court, in the footnote quoted above, speaks of the legislature having demonstrated, in retaining ORS 314.280, an intent to treat a smallclass of taxpayers more individually than another class of taxpayers.Id. at 354 n 7. The court did not focus on individual taxpayers — it referred to classes of taxpayers, composed of financial institutions or various types of utilities, exempt from UDITPA. Individual judgment refers to judgment about a small class of taxpayers and not to the judgment of any individual auditor about a particular taxpayer. The department has exercised just such judgment as to classes. Its rules under ORS 314.280 differentiate treatment of financial institutions, railroads, airlines, and trucking companies.
The foregoing does not mean that there is no taxpayer-specific flexibility in ORS 314.280. However, the court in FisherBroadcasting was not discussing that point, confronted as it was with only a comparison of the UDITPA and ORS 314.280 regimes. Taxpayer-specific flexibility exists under ORS 314.280 — it is described in subsection (2) of the statute. Once again, however, process and timing are important. The request for flexibility must originate with the taxpayer and be made in the face of a default position of existing rules. The *Page 35 
request may or may not be granted by the department. However, if the request is not granted, there remain the rules previously promulgated to guide the audit of the return. If the taxpayer's request is granted it can be said that individual flexibility has occurred.[18] However, the important point is that, under the statute, flexibility is a product or endpoint of a process and not the starting point. Under the court's construction of ORS 314.280, the department must have rules in place to guide all classes of taxpayers as to their obligations.[19] It then follows that if no taxpayer felt that alternatives were needed, a consistent interpretation of the broad statutory standard would prevail — all taxpayers in the class, for example, all trucking companies, could have filed in accordance with rules that the department must believe represent a method for fairly and accurately apportioning income of trucking companies.
The department asserts such a result cannot be the law because it has purported to reserve to itself unfettered discretion and because the court in Fisher Broadcasting permitted or even required such unfettered discretion. For the reasons set forth above, those positions are without merit.
This result is, in fact, not a surprise to the department. This court earlier told it of these principles. In ATT v. Department ofRevenue, 15 OTR 202 (2000), the department also had in place a rule under ORS 314.280 that, following a court decision under UDITPA, became unpleasant in its application.[20] The department did not change its rule, although it clearly could *Page 36 
have done so.[21] The taxpayer filed its returns in accordance with the rule in place. Id. at 203. The department proposed a deficiency based on a position inconsistent with its own rule. Id. at 203-04. This court stated:
 "The department argues that inclusion of gross receipts from sales of securities and other intangibles clearly distorts taxpayer's apportionable income. That may be, but the remedy is not an ad hoc "rewriting" of its own rules. As in Sherwin-Williams [Co. v. Dept. of Revenue, 14 OTR 384 (1998), aff'd 329 Or 599, 996 P2d 500 (2000)], the resolution must be by amendment of the statute or administrative rule."
 ATT, 15 OTR at 206. That position of this court was not new. As far back as 1968, the Oregon Supreme Court had observed, with regard to ORS314.280, that apportionment was to be done by rule. Equitable,251 Or at 77.
The position of the department in this case demonstrates another instance in which UDITPA principles have been allowed to seep into and pollute the ORS 314.280 regime. The idea that the department can "permit or require" matters related to apportionment of income occurs both in UDITPA and ORS 314.280. However, as discussed above, in ORS 314.280 that *Page 37 
language must be read to mean that "requirements" be as stated in rules promulgated in advance for general guidance of, and application to, classes of taxpayers. Then there is the possibility of requirements also being imposed as conditions to acceptance by the department of alternatives proposed by the taxpayer.
The UDITPA regime is quite different. Rather than being a broad general statutory statement of general principles or goals that must, legally and practically, be fleshed out with rules, the UDITPA statutory scheme is a detailed statute with quite specific provisions on the apportionment process. This detailed statement no doubt has its origin in the fact that UDITPA is designed to be a uniform law, consistently applied among the states that adopt it.[22] There is, however, a provision for variation from the UDITPA general formula, found in ORS314.670. Because the detailed statutory rules provide the default position, about which either the department or the taxpayer can have different views, ORS 314.670 allows the department to permit or require variation. It is important to note that the notion of the department disagreeing with the applicability of a starting position makes sense when the department has not defined the starting position but is an agency with expertise in the matters covered by the statute and the final application of those rules against statutory standards. That power exists for the department in ORS 314.670 and its related rules. The rulemaking history under Revised M and its predecessors started with questions of segregated accounting. At some point the department converted the rule to one dealing with departures from the rules. At that point, language from the rules under ORS 314.670 on *Page 38 
departure from statutory formulas was borrowed, apparently, without careful analysis of whether it fit the situation of ORS 314.280. This process has been a common problem, as evidenced by FisherBroadcasting. Once borrowing from ORS 314.670 rules took place, the concept of the department taking the initiative in requiring changes, valid under ORS 314.670, was improperly imported into the rules for the alternative apportionment formula outlined in ORS 314.280.
This importation was improper because, although it is logical for the department to have the power to initiate changes or modifications of statutory rules to fulfill statutory policy, it is nonsensical to authorize and require the department to make the detailed formula rules in the first instance, the principle of ORS 314.280, only to then permit the department to abandon them on its own motion. Neither this court nor any other has placed significant constraints on the range of choices or decisions that the department can employ in its rulemaking. But, having made its regulatory bed, the department must lie in it, at least until it "changes the sheets" by further or different rulemaking.
If the notion of department authority to require methods was transported from the beginning of the process to the audit stage by a confusion of UDITPA principles with those governing ORS 314.280, that was an unfortunate example of the type of confusion that has occurred over time. As mentioned above, the Fisher Broadcasting case stands as a prime example of the problems created by confusion or conflation of the two systems. But it is not the only instance. Indeed, the case ofCrocker Equipment Leasing, Inc. v. Depart. of Rev., 314 Or 122,838 P2d 552 (1992) (Crocker), and the apparent origin of the department's concern about the treatment of intangibles by financial institutions, is another prime example. Although clearly governed by ORS 314.280, the case was argued in the Oregon Supreme Court on the *Page 39 
basis that there was no challenge to validity of the department regulation on changes to methods that, as was true of that regulation discussed in Fisher Broadcasting, incorporated the principles of UDITPA into the ORS 314.280 regime. Id. at 130. The court went on, therefore, to apply UDITPA standards, burdens of proof, and case law pronouncements. See id. at 138 n 3, 131, 131 n 6. The footnotes just cited demonstrate the unease with which the court proceeded. That turned out to be justified, for in Fisher Broadcasting the court held that when the practice was challenged, the alternative methods regime of the ORS314.670 rules could not be incorporated into the ORS 314.280
regime.[23] *Page 40 
Regardless of how the provisions of Revised M or its predecessors came to be adopted, it is beyond question that they were susceptible to change by the department at any time, as indeed were the provisions of the E Reg. Therefore, when the Crocker case presented the department with the uncomfortable reality that some taxpayers might be able to file with intangibles in the property factor, the department, for whatever reason,[24] chose to forego using its conceded authority to amend the E Reg so as to require inclusion of intangibles in the property factor for banks. This occurred even though its counsel, who appeared in this case with a fundamentally different position, had advised it that an amendment to the E Reg could be done, even with retroactive effect.
In advice to the senior staff person in this area, counsel Marilyn Harbur (Harbur) on January 19, 1993, wrote, in the context of theCrocker decision and the then applicable "alternative method" rule:
 "The department faces only slight risk that a retroactive amendment of OAR 150-314.280-(E) to include intangible property would be overturned if tested in court. The alternative to retroactive amendment of OAR 150-314.280-(E) is simply to allow those few "unwilling" taxpayers to continue to use the standard formula for tax years 1986 through the effective date of a prospective rule change."
This advice was that, absent a rule amendment changing the E Reg, taxpayers unwilling to include intangibles would have to be permitted to follow the E Reg until the N Reg became effective. That, of course, is all the taxpayer in this matter has requested. *Page 41 
The department, in fact, appears to have accepted Harbur's advice about the consequences of not amending the E Reg.[25] The record includes an internal memorandum to corporation audit staff setting out a position that, while the N Reg would include intangibles in apportionment for banks after January 1, 1993, for the period from January 1, 1987 to January 1, 1993, only a taxpayer could initiate a change resulting in inclusion of intangible in the property factor. (Ptf's Ex 11.) There followed the publication of internal policy statements (Ptf's Ex 16-18) for use by auditors in the years during which the audit of this taxpayer occurred. Those statements consistently set out the conclusion that for the years in question, only the taxpayer could request inclusion of intangibles in the property factor. They also depict a regulatory scheme in which the rules for financial institutions in the E Reg govern right up to the time that they are replaced by the provisions of the N Reg.
Given the fact that its E Reg did not permit the inclusion of intangibles in the property factor and that its internal memoranda and instructions to auditors directed that intangibles only be considered for inclusion if the taxpayer requested that treatment, as the taxpayer in Crocker had done, it is clear why the department now argues that Revised M somehow justifies individualized decision-making by the auditor on this case. Absent that argument there would be absolutely nothing to support the department's actions. However, for the reasons discussed above, Revised M is fundamentally at odds with the statutory provisions of ORS 314.280 and the duty of the department to act by rule if it wishes to change the methods taxpayers must use.
The effort of the department in this case is an attempt to justify actions by an auditor, who, the record shows: *Page 42 
 (1) Initiated a change in the apportionment method not requested by the taxpayer.
 (2) Concluded, on the basis of little or no analysis, that his method was superior to that set out by the department in its E Reg and its instructions to auditors.
 (3) Developed application rules made necessary by his approach — rules on locating intangibles that have no foundation in department action, training, or guidance to auditors.
 (4) Applied Crocker principles for an audit under ORS 314.280, even though Crocker was decided using UDITPA principles.
 (5) Persisted in following Crocker even though he admitted the factual posture of the taxpayer in Crocker and this taxpayer were materially different.
The actions of the auditor in this case demonstrate all of the dangers of unconstrained and unreviewed ad hoc decision-making. The auditor developed his own methods. Counsel for the department argued that their position justified this and independent nonuniform action by other auditors. Counsel defended this outcome with the observation that any perceived problems with such an approach would be subject to review by this court, an adequate process in their view. That position demonstrates a profound failure to understand well established principles of administrative law regarding rulemaking duty. Seesupra note 16. One of those rules is that court review is not a substitute for properly conducted agency action. Ross, 300 Or at 519. The position is also impossible to understand given the department's strenuous efforts in this case to insure that little if any information regarding the actions of this and other auditors on the cases of other taxpayers be disclosed to the taxpayers or the court. The department has put forward a broad reading of ORS 314.835 in refusing to divulge information as to how other auditors may have treated other similarly situated taxpayers. It may be that the broad reading that the department gives to ORS 314.835 is correct. If so, however, the ability of anyone outside the department to find out in fact what the department does, in any case other than their own, is *Page 43 
virtually eliminated. In such a case, it becomes imperative for the department to announce in advance to taxpayers and its auditors what the rules are, so that by audit and supervision it can create a context of consistency. It is also doubly important that, if taxpayers follow those rules, as was done here, they not be subject to imposition of alternative methods unless they ask for and thereby consent to such departures. Exactly what those principles are, happily, can be discerned from the language of ORS 314.280 itself. To require less would be to expose taxpayers to only a hope of reasonably consistent treatment — without any assurance that it would be forthcoming. The department's position, in effect that it be trusted, subject only to judicial review, is not consistent with a system of government of laws and not of men.
In Bancorp II, this court analyzed the question of the legality of government action on the basis that Revised M did not apply to the analysis. On remand the court has, consistent with the direction of the Supreme Court, considered Revised M in the analysis and the interpretation of that rule asserted by the department. However, for the reasons set forth in this opinion, Revised M, when reviewed for its substantive compliance with ORS 314.280, cannot serve as a basis or justification for the actions of the auditor or the department in this matter. The returns of the taxpayer were prepared in accordance with the valid E Reg and, on the point at issue, must be accepted.
C. Application of Revised M to taxpayer
Taxpayer also argues that, even if the provisions of Revised M granting the department power to require adjustments to returns were valid, the department did not properly apply that rule to taxpayer for the tax years in question. Taxpayer's primary contention in that regard is that the department failed to show that taxpayer's original returns did not "fairly and accurately *Page 44 
reflect the net income of the business done within Oregon, based on the taxpayer's business activity within Oregon." OAR 150-314.280-(M)(2) (1995). Taxpayer cites Twentieth Century Fox-Film v. Depart. ofRev., 299 Or 220, 700 P2d 1035 (1985), for the proposition that, before the department could adjust taxpayer's returns, it needed to first demonstrate that those returns were not fair and accurate. Id. at 223 (construing ORS 314.670, which contains language nearly identical to that found in Revised M, to so require); see also Crocker, 314 Or at 131
(holding, under a prior version of Revised M that was based on ORS314.670, that when a taxpayer seeks an alternative apportionment, the taxpayer has the burden of proving by a preponderance of the evidence that the usual apportionment formula is not fair). The court finds even more persuasive a statement in Fisher Broadcasting, which does not touch on UDITPA or the rules adopted under it or with reference to it, but rather focuses on ORS 314.280 itself and the department's rules adopted under that statute generally: "It was only after the department determined that a particular set of business circumstances required the use of one reporting method that a rebuttable presumption in favor of that method would arise." 321 Or at 354. The presumption described by the Supreme Court is that a return filed in accordance with the department's rules adopted under ORS 314.280 will fairly and accurately reflect the net income of taxpayer's Oregon operations. That presumption is rebuttable because ORS 314.280(2) provides for a mechanism by which a taxpayer can show that the presumption is false in a particular case, and then, with the department's permission, file an adjusted return that does fairly and accurately reflect the net income of the taxpayer's Oregon operations. Similarly, assuming that Revised M is valid, the department could rebut the presumption and require an adjusted return regardless of the taxpayer's wishes. *Page 45 
Whether an adjustment is required or permitted by the department, however, the key prerequisite for any adjustment is a finding that the original return, filed in accordance with the department's other rules, is not fair and accurate; if that prerequisite is not met, then, even accepting arguendo the validity of Revised M, no adjustment can be permitted or required.[26] So much is clear from the text of subsection (2) of Revised M itself, which provides that adjustments can be permitted or required only "[i]f" application of the department's other rules is not fair and accurate. The question, then, is whether taxpayer's original returns, filed in accordance with the E Reg, "do not fairly and accurately reflect the net income of the business done within Oregon, based on the taxpayer's business activity within Oregon." OAR 150-314.280-(M)(2) (1995). If the returns are not fair and accurate, then the department's adjustments might be proper; otherwise, those adjustments were clearly improper. See Realty Group v. Dept. ofRev., 299 Or 377, 382 n 3, 702 P2d 1075 (1985) (stating that an "agency is bound to follow" rules promulgated by it).
The department contests that conclusion, arguing that, instead, it has authority to require an adjustment whenever it decides that the adjustment would render the taxpayer's return more fair and accurate. That view, however, as just discussed, is completely unsupported by the text of Revised M. Moreover, the department has not cited, and the court's own research has not revealed, any other source of law that would support the department's view.[27] Courts have long *Page 46 
recognized that apportionment is not an exact science; kicking the ball through the uprights is all that is needed, not a shot through a bulls-eye. See Stonebridge Life Ins. Co. I v. Dept. of Rev., 18 OTR 423,428-32 (2006) (noting the difficulty in proving unconstitutional apportionment). To be fair and accurate, an apportionment need not be the most fair and accurate possible. See Equitable Savings Loan v.Dept. of Rev., 5 OTR 661, 669 (1974) ("[ORS 314.280] does not require an exact apportionment. Such an apportionment would, indeed, be impossible, it only *Page 47 
requires a reasonable approximation.")[28] *Page 48 
The department reasons that, under Crocker, it was required to include intangibles in the property factor in taxpayer's case because only that method would produce a fair and accurate apportionment. InCrocker, the department, applying a predecessor to Revised M, had excluded intangible property from the property factor when it apportioned the taxpayer's income. 314 Or at 129. The taxpayer argued that such exclusion was wrong because it led to an unfair apportionment.Id. at 131-32. The Supreme Court, based on the stipulated position of the parties, and applied UDITPA principles, noting that approximately 98 percent of the taxpayer's income came from intangible property and that the exclusion of intangible property from the property factor increased the taxpayer's tax liability by six times. Id. at 132. The department seeks to compare taxpayer in this case to the taxpayer inCrocker, and argues that, because the Supreme Court in that case required inclusion of intangible property in the property factor, such inclusion is required in this case.[29] *Page 49 
The department's comparison is inapt and its reasoning flawed. First, unlike the taxpayer in Crocker, taxpayer in this case was based in Oregon during the tax years in question and had substantial property, payroll, and gross receipts factors here. Id. at 131. Crocker was based in California and had only limited property in Oregon. The department, in fact, recognized that the taxpayer's situation was opposite that ofCrocker.[30] Second, unlike in Crocker, the difference between including and excluding intangible property is small: including intangible property in the property factor increases taxpayer's tax liability by less than 15 percent. Absent compelling evidence not present in this case, the court would be hard pressed to find, as between two methods of apportionment that result in a difference in tax liability of only 15 percent, that the one method was fair and accurate and the other not. See Stonebridge, 18 OTR at 433-435 (noting that those cases finding an apportionment unconstitutional described a difference of over 250 percent). It is far more likely in such an instance that either both methods are fair and accurate, or neither is. The court finds that taxpayer's apportionment, as reflected in the returns it originally filed, "fairly and accurately reflect[s] the net income of the business done within Oregon, based on the taxpayer's business activity within Oregon." OAR 150-314.280-(M) (1995). For that reason, even if Revised M permitted the actions of the auditor and department, *Page 50 
the adjustments required by the department are void.
D. Taxpayer's constitutional argument
As stated above, the conclusion of the Oregon Supreme Court as to the constitutionality of retroactive application of Revised M is the law of the case. The taxpayer has raised another constitutional argument, however. At the trial on remand, taxpayer sought discovery from the department of certain information about other taxpayers similarly situated to taxpayer. The purpose of that discovery request was to help taxpayer prove its argument that the department had violated the Due Process Clause and the Equal Protection Clause of theFourteenth Amendment to the United States Constitution by "acting arbitrarily" and by "singl[ing] plaintiff out for disparate treatment." The parties could not reach an agreement regarding taxpayer's discovery request, and, ultimately, taxpayer filed a motion to compel discovery and the department filed a motion for a protective order. This court held off ruling on the parties' motions as they continued in their attempts to resolve the discovery dispute. On the eve of trial, with no resolution to the dispute in sight, the court granted taxpayer's motion in part, correspondingly denied the department's motion in part, and ordered the department to deliver certain information to taxpayer. The department filed a writ of mandamus with the Supreme Court, which stayed this court's order and issued an alternative writ of mandamus ordering this court to vacate the order or show cause for not doing so. U.S. Bancorpv. Dept. of Rev., 340 Or 412, 134 P3d 170 (2006). Pursuant to the parties' wishes, this court vacated the discovery order, and the Supreme Court dismissed the mandamus proceedings. U.S. Bancorp v. Dept. ofRev., 340 Or 486, 135 P3d 320 (2006). A limited amount of evidence was introduced at trial relating *Page 51 
to taxpayer's constitutional claims, but the evidence that taxpayer sought through its motion to compel was not introduced because taxpayer never received that evidence from the department. Given this court's resolution of taxpayer's other arguments, as well as the limited extent of the evidence that was able to be introduced at trial on taxpayer's constitutional argument due to the parties' discovery dispute and the proceedings in the Supreme Court, this court concludes that it is neither necessary nor prudent to attempt to resolve taxpayer's constitutional argument at this time.[31]
E. Should the department prevail on itscounterclaim?
In its Answer to taxpayer's Fifth Amended Complaint, the department asserted a counterclaim alleging that it was entitled to certain taxes related to the calculation of the sales factor used in apportioning taxpayer's income for the tax years in dispute. To summarize the counterclaim, it suffices to say the following. To offset the department's inclusion of intangible property in the property factor of the E Reg, the department agreed to depart from its usual rule regarding the calculation of the gross revenue factor under that rule; the result was an apportionment calculation consistent with the N Reg. When taxpayer appealed the department's inclusion of intangible property in the property factor, the department counterclaimed that if intangible property is not *Page 52 
included in the property factor, the gross revenue factor should not be adjusted either. That counterclaim is similar to the counterclaim the department has asserted since the beginning of this case.
Following this court's decision in Bancorp I, in which taxpayer prevailed on its claim regarding the inclusion of intangible property in the property factor, taxpayer conceded the department's counterclaim.Bancorp II, 17 OTR at 234; U.S. Bancorp, 17 OTR at 274 (clarifying the court's earlier opinion); Bancorp III, 337 Or at 642 n 10 (noting that taxpayer's concession was "without reservation of a right of appeal"). That resolution of the matter resulted in a judgment that returned the calculation of taxpayer's net tax liability to the amount it would have been had taxpayer's returns never been adjusted from what the E Reg prescribed. As noted in Bancorp III, taxpayer did not file a cross-appeal regarding the counterclaim even though the department appealed this court's ruling in Bancorp I, which ostensibly provided the basis for taxpayer's concession of the counterclaim. 337 Or at 642 n 10. Accordingly, the Supreme Court held that taxpayer had "waived any claim to relief as to the department's counterclaim." Id.
The irrevocable nature of taxpayer's concession becomes more apparent when considered in light of the one caveat taxpayer did provide: that the concession would become void should taxpayer prevail in the Supreme Court on its statute of limitations claim. See id. (describing the caveat). Importantly, taxpayer did not state that the concession would become void should the department prevail in the Supreme Court on its appeal of this court's ruling in Bancorp I. Thus, even if this court's ruling in Bancorp I provided the basis for taxpayer's concession regarding the department's counterclaim, *Page 53 
taxpayer's failure to reserve a right to revoke that concession upon reversal of that ruling, coupled with taxpayer's explicit reservation of a right to revoke the concession upon reversal of this court's ruling inBancorp II, shows that taxpayer intended to concede the department's counterclaim even if the Supreme Court reversed this court's ruling inBancorp I, which it did.
Nonetheless, at the end of the trial on remand, taxpayer moved to dismiss the department's counterclaim under Tax Court Rule 60 (motion for dismissal at trial) on the ground that the department had introduced no evidence to prove the counterclaim. See Newton v. Clackamas CountyAssessor, 18 OTR 389, 390-91 (2006) (granting motion to dismiss at trial where taxpayers presented no evidence to support their claim). At the time of taxpayer's motion, the department was unable to point to anything in the record that supported its counterclaim, and the court granted the motion. In reviewing the history of this case in preparation of this Opinion, however, the court found another, and more appropriate, reason to have granted taxpayer's motion: the department had no need to introduce evidence to support its counterclaim in the trial on remand because taxpayer had already irrevocably conceded the counterclaim in the earlier trial before this court. In other words, dismissal was proper because the department had no need to reassert its counterclaim on remand. Accordingly, the department is entitled to a judgment in its favor on its counterclaim.[32] *Page 54 
 V. CONCLUSION
Based on the foregoing, the court concludes that Revised M cannot and does not allow the department, on audit, to require adjustments to taxpayer returns filed in accordance with an existing substantive rule. Further, even if Revised M were valid in that regard, the department did not properly apply it to taxpayer for the tax years in dispute. The department did not determine that and it is not true that taxpayer's original returns failed to fairly and accurately reflect taxpayer's net income from Oregon operations. The court also concludes that the department is entitled to judgment in its favor on its counterclaim, given taxpayer's irrevocable concession of the counterclaim earlier in this case Now, therefore,
IT IS DECIDED that Defendant shall refund to Plaintiff the amount of tax attributable to the inclusion of intangible property in the property factor of OAR 150-314.280-(E) (1987) for tax years 1988 through 1992, plus statutory interest, minus the amount of the department's counterclaim plus statutory interest.
[1] Although the statement of facts contained in Bancorp III is based primarily on a summary judgment record, each of the facts stated in the quoted portion of the Supreme Court's opinion was, at one point or another, proven at trial or agreed upon by the parties for purposes of dispensing with proof requirements. Additional facts proven at the trial on remand and necessary to the disposition of this case are mentioned as they become relevant to this opinion.
[2] All references to the Oregon Revised Statutes (ORS) are to the 1987 edition unless otherwise noted. Neither ORS 314.280 nor ORS 314.670
changed during the relevant years. See Bancorp III, 337 Or at 627 n 2, 632 n 5 (describing amendments to ORS 314.280 and ORS 314.670).
[3] The department admits as much in its pretrial brief on remand, when it quotes the following statement from oral argument before the Supreme Court in Bancorp III: "For the purpose of arguing this motion, plaintiff has absolutely agreed that the new rule (M)[,] that the department had the authority to promulgate that rule." (Def's Pretrial Br on Remand at 14 n 6.)
[4] ORS 43.130 states:
 "The effect of a judgment, decree or final order in an action, suit or proceeding before a court or judge of this state or of the United States, having jurisdiction is as follows:
 "* * * * * "(2) In other cases, the judgment, decree or order is, in respect to the matter directly determined, conclusive between the parties, their representatives and their successors in interest by title subsequent to the commencement of the action, suit or proceeding, litigating for the same thing, under the same title and in the same capacity."
[5] ORS 43.130 also states that it applies only to those matters "directly determined" by the prior judgment, decree or order. This court has already shown that taxpayer's second and third arguments against application of Revised M were not considered, let alone "directly determined," in Bancorp III.
[6] ORS 43.160 states: "That only is determined by a former judgment, decree or order which appears on its face to have been so determined or which was actually and necessarily included therein or necessary thereto."
[7] Promulgation of and compliance with rules would also protect against claims made under the Equal Protection Clause of the Constitution of the United States.
[8] Nor can there be any question that the rulemaking requirement, found in ORS 314.280(1), applies to all aspects of the segregated method and the apportionment method, including the apportionment bases or formulas. Although subsection (2) of ORS 314.280 focuses more on bases or formulas for apportionment, the opening clause of subsection (2) states, "The provisions of subsection (1) of this section dealing with the apportionment of income earned from sources both within and without the State of Oregon are designed to allocate to the State of Oregon on a fair and equitable basis a proportion of such income earned from sources both within and without the state." This language ties those bases to the more general goals of subsection (1). Subsection (1) addresses "methods," but a method logically includes the subordinate feature of bases or formulas that must be subject to, and carried out by, rules and regulations. The actions of the department confirm and are consistent with all of these conclusions. For all years at issue, and indeed before and after the years at issue, the department has promulgated detailed rules relating to apportionment bases or formulas so as to apply the goals and principles of ORS 314.280 to all industries subject to ORS314.280.
[9] Uniformity, of course, can involve a settled substantive rule or a settled procedure for departure from a general rule.
[10] That said, the analysis would not change if ORS 308.205 were involved. That statute provides the department with authority to specify methods or procedures for valuation, but also contains a number of precise statements of legislative judgment about the meaning of "real market value." The statutory scheme of ORS 308.205 is not at all the same as the general goals statement of ORS 314.280 coupled with a direction to make rules.
[11] The regulatory position of the department on treatment of intangibles in the property factor has changed over time. The rule for financial institutions at one time specified that gross loans be substituted for the factor based on real and tangible property. SeeEquitable, 251 Or at 77. This fact, together with the reliance exclusively on real and tangible property until the return, in 1993, to use of intangibles in the property factor under the N Reg, should be proof enough that there is no Platonic ideal at work here. The department has made, and has been authorized to make, such changes in course, by rule. This case, of course, raises the question of whether the department may do so other than by rule.
[12] The department has actually argued this power exists, even under N Reg or any other rule adopted under ORS 314.280.
[13] Prior to Revised M, OAR 150-314.280-(M) (M Reg) adopted in 1987, also contained the provisions found in Revised M speaking to the department's ability to permit or require certain things. The 1995 amendments removed a restriction the department had imposed on itself to the effect that alternative methods or bases of apportionment could only be proposed where a constitutional violation existed. The department has not explained why it felt it must obey that regulatory restriction until the rule was amended but now feels it need not obey the specific provisions of the E Reg.
[14] ORS 314.280(2) requires the taxpayer to "submit an alternative basis of apportionment * * * and explain that basis in full in the return of the taxpayer."
[15] This is not to say that "requirements" could not also be stated by the department as conditions to the acceptance of alternative apportionment approaches. The question of whether such action by auditors would need to be in accordance with rules giving guidance to employees and taxpayers is not presented here.
[16] At the trial on this matter and in post-trial writings and arguments, the department argued that its position on the timing and method of applying Revised M did not lead to a threat of unconstrained, individualized ad hoc and inconsistent decision-making by auditors. The department asserted constraint existed because this court existed to review auditor action. However, the Oregon Supreme Court has recognized that when, as with the broad terms of ORS 314.280, the legislature has entrusted policy and interpretive functions to an agency, it is not proper for a court to undertake those tasks, beyond the ordinary function of judicial review. Ross, 300 Or at 519.
[17] From time to time the department has appeared to argue thatFisher Broadcasting condemns all incorporation of UDITPA concepts into the regime of ORS 314.280. Fisher Broadcasting does not go so far. It involved an instance where there were actual conflicts between the language of UDITPA and that of ORS 314.280 regarding presumptions and the use of business activity as opposed to income tests. The department, apart from this case, has recognized the fact that FisherBroadcasting does not bar all incorporation. It continues to use incorporation of UDITPA definitions generally.
[18] Again, as stated above, the question of whether rules must exist to guide the discretionary decision-making of the department about when alternative methods are allowed is not before the court.
[19] And, as noted above, the department has consistently acted in just this way by promulgating several comprehensive rule regimes for various utility industries and financial organizations.
[20] As the Supreme Court noted in its description of the history of this case in Bancorp III, the decision in Crocker Equipment Leasing Inc.v. Department of Revenue, 314 Or 122, 838 P2d 552 (1992) (Crocker) left the department with one rule under UDITPA principles but the opposite rule under its existing rules under ORS 314.280.
[21] In these situations, there is yet another timing problem in that, by the time the case law develops to announce a principle applicable in an earlier period, changes in rules would need to be "retroactive" in effect in order to cover the earlier period. On this question of retroactivity, the courts, including the Supreme Court in BancorpIII, have been quite generous.
[22] The concern for uniformity among states is demonstrated inAtlantic Richfield Co. v. Department of Revenue, 300 Or 637, 717 P2d 613
(1986), a case in which the court, in arriving at a decision under UDITPA, surveyed practices in other states that had adopted similar provisions.
[23] Nothing in Fisher Broadcasting suggests that the department would not be free to incorporate into the ORS 314.280 regime definitions and formulas or components found in UDITPA. Nor does Crocker necessarily limit the choices the department might make in its statutory role to specify apportionment methods. Crocker was decided solely on statutory bases and did not purport to announce a constitutional test for apportionment at issue there.
[24] It appears there were good reasons. There is material in the record that suggests the department may have deferred any amendment to the E Reg because, by the time Crocker was decided, the department was on the verge of adopting the N Reg. The N Reg would return intangible property to the factors, but only for 1993 and later years.
[25] Exhibit 17 in fact indicates that the advice on proceeding may have been confirmation of department staff decisions taken in late 1992.
[26] The department argues the plaintiff has the burden of proof under ORS 305.427, and therefore, it has no obligation to show any satisfaction of this condition. But this is a question of a condition to pre-litigation action and one where the department, assuming its rule is valid, has constrained itself to satisfy the condition if it proposes a change.
[27] There is a statement in Fisher Broadcasting which refers to the concept of one apportionment method being more fair and accurate than another: "Rather, [the plaintiff] focused its proof on which method more fairly and accurately reflects its net income." 321 Or at 358-59
(quoting Fisher Broadcasting v. Dept. of Rev., 13 OTR 32, 39 (1994)). That statement, however, is inapposite; not only was it made in the context of the Supreme Court faulting this court's reasoning, but it does not support the department's contention and relates instead to a different issue: whether a taxpayer should use the apportionment method of reporting or the segregated method. That issue, addressed in ORS314.280(1), is not one where the parties proceed under rules unless the taxpayer requests different treatment.
[28] Nonetheless, the department applied its view of Revised M to its audit of taxpayer's returns for the tax years in question. That is unfortunate for the department in this case because the department failed to present evidence that taxpayer's original returns for the tax years in question were not fair and accurate; instead, the department focused its energy on attempting to show that its required adjustments would render taxpayer's returns more fair and accurate.
Paul Kraft, the department auditor who reviewed taxpayer's returns and whose name appears on the NODs received by taxpayer, explained in his audit report that "the department must decide whether inclusion of intangibles will more fairly and accurately reflect the net income of the taxpayer." (Ptf's Ex 12 at 11.) It is true that Kraft found that exclusion of intangibles "does not reasonably reflect the fact that 91-95% of the bank's income was attributable to loans or intangible property, and does not fairly reflect the unitary organization's net income in Oregon." (Id. at 12.) However, Kraft's ultimate conclusion was that inclusion of intangibles "will more fairly and accurately reflect" taxpayer's net income from Oregon operations under ORS 314.280.Id. Similarly, in an affidavit signed by Kraft, he states both that "[t]he exclusion of intangible property does not result in a fair or accurate apportionment of net income" and that "I was legally required or permitted to * * * adjust the plaintiff's property factor, if such adjustment resulted in a more accurate apportionment of plaintiffs' net income." (Ptf's Ex 39 at 2.)
[29] It is noteworthy that, for many years, the department felt that exclusion of intangible property from the property factor led to a fair and accurate apportionment. It was only after Crocker that the department changed its mind on that score.
[30] In the department's Opinion and Order for the 1984 and 1985 years of taxpayer, of which Kraft was aware, the department stated "US Bancorp is almost identically the reverse of Crocker." (Ptf's Ex 8 at 10, Bates 2683.) It is ironic that, in accepting, for purposes of argument, the department position on the validity of Revised M, the court is faced with the proposition that a decision for another taxpayer, quite different from the taxpayer, is considered controlling, even if one sets aside the fact that Crocker was decided under the different principles of UDITPA. One must ask how this is at all consistent with the department's professed interest in individualized decision-making.
[31] Similarly, the court does not now consider taxpayer's contention that the NODs for the tax years at issue are invalid because they fail to specify the regulation upon which the department's adjustments were based. See ORS 305.265(2)(b) (requiring that notices of deficiency "[g]ive a reference to the statute, regulation or department ruling upon which the adjustment is based"); Preble v. Dept. of Rev., 331 Or 320,325 14 P3d 613 (2000) ("[A] notice of deficiency is invalid if it does not include the reason or the authority for each adjustment * * *."). Although the department's explanation of adjustments specified that ORS314.280 provided the basis for the adjustments, the department did not cite Revised M specifically. Kraft testified at a deposition that he did not rely on Revised M when he audited taxpayer's returns. (Ptf's Ex 35A at 6-7.) Kraft later testified that he did rely on that rule, although he could not explain why he changed his testimony, who might have influenced him to change his testimony, or what he had thought in the first place. (Id. at 6-9.)
[32] During the various proceedings, the court ruled on several motions from the bench. For the purpose of memorializing those rulings, the court notes that they were decided as follows. Defendant's Motion for an Order Staying Discovery was denied at the January 23, 2006, case management conference. Defendant's Motion to Enlarge Time for Response to Plaintiff's Motion to Compel Production of Documents was granted at the February 1, 2006, hearing. Defendant's Motion for Order Entering Judgment and Request for Order Staying All Proceedings and both of Defendant's Rule 21 Motions in Response to Plaintiff's Fifth Amended Complaint were denied at the February 8, 2006, hearing.